### 12301

BUCKEYE COTTON OIL CO. v. CHERAW GINNING CO. *ET AL.*

(140 S. E., 581)

1. BILLS AND NOTES—CORPORATE OFFICERS AND STOCKHOLDERS INDORSING CORPORATE NOTE CANNOT AVAIL THEMSELVES OF FAILURE OF NOTICE OF DISHONOR, AND ARE NOT DISCHARGED BY EXTENSION.—Where indorsers on note secured by mortgage and executed by corporation were stockholders and officers of such maker corporation, defense of failure of notice of dishonor is unavailing, nor are they discharged by virtue of extension of time.

2. BILLS AND NOTES—EVIDENCE HELD TO SUPPORT FINDING THAT INDORSEMENTS ON FIRST OF SERIES OF SECURED NOTES WERE ONLY AS GUARANTY OF SUCH NOTE.—In action for foreclosure of mortgage and for judgment against maker and indorsers on first of series of notes secured thereby, evidence *held* to support finding that indorsements on such note were given only as guaranty or security that such note would be paid in full in case security, properly applied, failed to extinguish it.

3. ESTOPPEL—ONE OF CORPORATE OFFICERS INDORSING NOTE, FAILING TO EXPLAIN TO PAYEE UNDERSTANDING HAD WITH ITS AGENT, WAS ESTOPPED FROM CHARGING PAYEE WITH KNOWLEDGE THEREOF.—Where one of corporate officers and stockholders indorsing first of series of corporate notes secured by mortgage communicated with payee relative thereto without advising of understanding that liability was only as guaranty of payment of first note in case security failed to extinguish it, he was thereafter estopped from charging payee with knowledge of such understanding had with its agent by other indorsers.

4. APPEAL AND ERROR—PAROL TESTIMONY VARYING TERMS OF WRITTEN CONTRACT, NOT OBJECTED TO, NOR SUBJECT TO EXCEPTION ON APPEAL, CANNOT BE OBJECTED TO ON APPEAL, BUT MUST BE CONSIDERED.—Where parol testimony tending to vary terms of written contract was not objected to at trial and was not the subject of exception in Supreme Court on appeal, it must be considered to reach a conclusion in the case.

Before MEMMINGER, J., Chesterfield, July, 1924. Reversed and remanded.

Action by the Buckeye Cotton Oil Company against the Cheraw Ginning Company and others. Judgment for plaintiff, and defendants appeal.

The report of the referee and the decree of the Circuit Judge are as follows:

## REPORT OF REFEREE

On August 21, 1919, the defendant Cheraw Ginning Company borrowed from the plaintiff the sum of $12,000, giving therefor its three notes for $4,000 each, bearing date August 21, 1919, and maturing May 1, 1920, May 1, 1921, and May 1, 1922, respectively, with interest from date at the rate of 8 per cent. per annum. In order to secure the payment of the said notes, the said Cheraw Ginning Company executed and delivered unto plaintiff its mortgage on certain property owned by it in the Town of Cheraw. S. C., in the complaint herein particularly described. In addition to the real estate, the mortgage also covered certain personal property, consisting of an outfit for a cotton gin. Prior to the delivery of the notes and mortgage, the

first note of the series, to wit, that maturing May 1, 1920, was indorsed by C. S. Lynch, P. J. Williams, P. B. Huntley, E. W. Laney, and G. W. Duvall. At the time of the institution of this suit, the full amount of all the notes, both principal and interest, was unpaid, with the sole exception of a payment of interest on the first note, which payment extinguished the interests thereon up to the maturity date thereof, to wit, May 1, 1920.

This action is brought for the foreclosure of the mortgage, and, as the complaint was originally cast, judgment was asked against the Cheraw Ginning Company and the indorsers for the full sum of $12,000, against which was to be credited the proceeds of sale. As amended, however, during the progress of the trial, the complaint seems to have been changed to the extent of asking judgment against the indorsers for the amount due on the first of the series of notes, to wit, $4,000, with interest thereon from May 1, 1920, and attorney's fees, subject to whatever equities they may have in the proceeds of sale of the mortgaged property. The complaint as originally drafted alleged that the indorsers became guarantors, jointly and severally, of the entire debt, as security outside of and beyond the security of the mortgage of real and personal property. As amended, however, it alleged that the indorsers became guarantors, jointly and severally, "of the first of the series of three notes," as additional security, "outside of and beyond the security of the mortgage of real and personal property."

The contention of the plaintiff, under its amended complaint, is that, by indorsing the first of this series of notes, each and every one of the indorsers became individually liable for its payment, irrespective of the application of the proceeds of sale of the mortgaged property and of the other two notes, and without reference whatever to, and in addition to, the real estate and personal property security.

The contention of the defendants is (a) that the indorsements were given to the first note alone, under a clear understanding with the agent and representative of the plaintiff; that the indorsements were to stand for the payment of the first note, with the benefit to the indorsers of the security held by the plaintiff, in other words, that, under the agreement of the parties at the time these five gentlemen indorsed this paper, the proceeds of the mortgaged property, when sold, were to be applied to the notes *seriatim,* and that, in case the proceeds of sale of the mortgaged property were inadequate to extinguish the first note, with interest and attorney's fees thereon, the indorsers would be liable for any deficit between the amount of such proceeds when so applied and the amount found to be due upon the said first note; (b) that, upon the maturity of the first note, the same was unpaid by the maker, and no notice of dishonor was given the indorsers or any of them, whereby their liability thereon became discharged; (c) that, without their consent, an extension was granted to the maker upon the first note for the period of one year, and that they became discharged as indorsers.

Before proceeding to discuss the main issue in this case, I will dispose of the second and third defenses set up by the indorsers. As I understand it, counsel for the defendants abandoned his defense of discharge by virtue of failure to give notice of dishonor. I apprehend that such defense would have been unavailing to him, because of the personnel of the indorsers; such personnel being made up entirely of the stockholders and officers of the maker corporation. And, for the same reason, and from the testimony in this case, I find that they are not discharged by virtue of the extension of time granted by the payee on the first note.

We now come to the consideration of the main issue in this case, to wit, were the indorsements on the first note a

security to the plaintiff "outside of and beyond the security of the mortgaged property?" or were the indorsements given to the first note under such a clear understanding with the agent and representative of the plaintiff company and under such circumstances as would warrant a finding that the indorsements were to stand for the payment of the first note with the benefit to the indorsers of the security held by the plaintiff, that is to say, that under the agreement beween the parties the proceeds of the mortgaged property, when sold, were to be applied *seriatim,* and that in case the proceeds of the sale of the mortgaged property were inadequate to extinguish the first note, with interest and attorney's fees thereon, the indorsers would be liable for any deficit between the amount of such proceeds of sale, when so applied, and the amount found to be due upon the first note?

It appears that the contention of the plaintiff and the contention of the defendants as to the contract, and its meaning, and its legal effect, is different from the legal effect of such an indorsement without considering extraneous parol evidence.   I apprehend that the proceeds of sale would be applied *pro rata* on the three notes if it were not proper for me to ascertain and determine the true agreement between the parties by means of such parol testimony.   The sole question being the determination of the extent of the protection to the plaintiff afforded by the five indorsements on note No. 1 of the series, and the extent to which the Court should enforce the liability of the indorsers thereunder, it is first necessary to determine whether the voluminous parol evidence offered by both sides should be considered.   The action was brought by the plaintiff upon the theory of a modification of the original contract on the ground of mutual mistake, and if the complaint does not sufficiently establish that to be the theory of plaintiff's action, it is certain that at the very outset of the trial plaintiff's counsel vigorously maintained this position and argued for the introduction of

parol evidence with the view of seeking the true agreement. At the close of the testimony counsel for the defendants amended, with the consent of the Court, his answer, asking reformation upon the ground of mutual mistake, in order, I assume, that the issue of mutual mistake and jurisdiction to reform might not be eliminated from the case. Throughout the entire case the door has been wide open for the introduction of competent parol testimony, which would tend to prove the true agreement between the parties.

I think that, as between the parties, where no rights of innocent holders in due course have intervened, and where the contest is between the immediate parties to the contract only, the better rule is to permit the introduction of parol testimony to prove a different agreement than that imported by a blank indorsement. 3 R. C. L., p. 1157. It is true that an indorsement in blank creates a presumption, but this presumption is not conclsive under the modern and better rule; and taking the view of this question which I do, it becomes unnecessary for me to determine the exact meaning of the mere indorsement in blank of the first of this series of notes, secured by real and personal property. To quote from the citation above noted:

"But where the rights of third persons are not affected, and the opponent is not a holder having paid value, ignorant of the circumstances attending the transfer, the Courts as a general rule have permitted the introduction of parol evidence to show that at the time of transfer the transferor stipulated against the liability imported by the blank indorsement of the instrument." *First Nat. Bank v. Reinman,* 93 Ark., 376; 125 S. W., 443; 28 L. R. A. (N. S.), 530; *Spann v. Baltzell,* 1 Fla., 302; 46 Am. Dec., 346; *Connelly v. Bourg,* 16 La. Ann., 108; 79 Am. Dec., 568; *Roads v. Webb,* 91 Me., 406; 40 A., 128; 64 Am. St. Rep., 246; *Johnson v. Martinus,* 9 N. J. Law, 144; 17 Am. Dec., 464; *Hill v. Shields,* 81 N. C., 250; 31 Am. Rep., 499; *Hill v.*

*Ely,* 5 Serg. & R., 363; 9 Am. Dec., 376; *Miner v. Robinson,* 1 D. Chip. (Vt.), 392; 12 Am. Dec., 694; *Rhodes v. Rissley,* 1 D. Chip., 52; N. Chip., 84 (Vt.), 1 Am. Dec., 696.

Also, to quote further:

"So the indorser of a bill of exchange or promissory note indorsed in blank will be permitted, in an action against him by the indorsee, to show that he indorsed merely to enable the indorsee to collect the money of the acceptor or drawer, and that it was agreed, when the indorsement was made, that he was not to be liable as indorser on the instrument," citing numerous authorities from numerous jurisdictions.

Also:

"Where the owner of a note, not a party to it, indorses it in blank to another, parol evidence is competent, in an action between them, to show an agreement that he was not to be liable in a certain event." *Brewer v. Woodward,* 54 Vt., 581; 41 Am. Rep., 857.

And in a Utah case (*Gregg v. Grosbeck,* 11 Utah, 310; 40 P., 202; 32 L. R. A., 266), parol evidence was permitted to show that prior to the transfer of a note an indorser, from whom payment was demanded, had, with the knowledge of the transferee, given instructions for the destruction of the indorsement.

So that, irrespective of what the strict legal interpretation of the indorsement might be, or what Courts might say, having nothing else before them, as to the extent of the liability of an indorsement under such circumstances, I conceive it as my duty to determine the true contract, or the meeting of the minds, between payee and indorsers, before attempting to adjudicate any rights in this case. With the law as I conceive it, in an action between the original parties to a negotiable instrument, and with both parties clamoring throughout the case for an investigation and adjudication of

the real contract, and with both parties introducing a volume of parol evidence, which could only be directed to this end, I think it is clearly within the province of this Court, and clearly its duty, to ascertain, determine, and enforce such contract as it finds the parties really made; and, under the circumstances, it seem to me that either side would be clearly estopped from disputing the Court's jurisdiction and authority to follow precisely this course. Not only does this seem to be the privilege and duty of this Court, but it seems to me that any other course would not be conducive to justice. No rights of innocent parties have intervened which call for the protection of this Court as against liberality of construction or admission of testimony, and the parties litigant who appear before me are the parties who made the contract, and none other; and, assuredly, their rights can in no way be injured, nor can injustice be done to any of them, by ascertaining what the contract was that they made, and enforcing it as so ascertained.

Having arrived at this conclusion of law, it becomes necessary to resort to the testimony for a solution of the problem. I find that prior to July, 1919, P. B. Huntley, one of the defendants herein, owned the real estate covered by the mortgage. At that time the Cheraw Ginning Company was not in existence. That during the latter part of July, 1919, Mr. A. P. Cain, district manager of plaintiff, and Mr. R. E. Evans, manager of plaintiff's mill in Charlotte, met with the defendants C. S. Lynch, P. B. Huntley, E. W. Laney, and P. J. Williams in Cheraw, S. C., in regard to the matter of a loan on the land described in the mortgage. I find that at the meeting, Mr. A. P. Cain told the parties that he did not regard the property as security for more than $8,000. I find that two or three weeks thereafter, the defendant Cheraw Ginning Company (which had evidently then been incorporated) drew a draft on the Buckeye Cotton

Oil Company for $12,000, with three notes and the mort-
gage securing the same attached, and that this draft was
turned down because the notes were not indorsed; that there-
after, on or about the 21st of August, 1919, Mr. Peeples,
traveling agent of the plaintiff, was sent to Cheraw to secure
the indorsement of the stockholders and directors on the
three notes and to close the transaction by authorizing a new
draft to be drawn for the $12,000 with the aforesaid in-
dorsements on all three notes; that all the defendants were
stockholders and directors of the Cheraw Ginning Com-
pany. I find that the parties met in the office of C. L. Prince,
Esq.; that Mr. Peeples was present, representing the plain-
tiff in the transaction, and that B. F. Pegues, Esq., was also
present solely to pass upon the title to the property for the
plaintiff; and present, also, were Messrs. McCreight,
Huntley, Williams, Laney, Lynch, and C. L. Prince, Esq.,
attorney for the Cheraw Ginning Company and for the de-
fendant P. B. Huntley and apparently for all of the defend-
ants; that on that morning the notes and mortgage were
executed by the Cheraw Ginning Company, and that the
question of indorsements on the notes was brought up by
Mr. Peeples, and that those indorsements were refused, and
most emphatically refused, by the defendant P. B. Huntley,
who, it appears, was very abrupt in his refusal by actually
throwing the notes down. There is no question but that at
this point the negotiations came to an impasse, and the ex-
tent of the liability of the indorsers on note No. 1 is, in my
opinion, determined by the facts and circumstances and by
what actually happened within the next few hours after this
abrupt refusal on the part of the defendant Huntley, for
it is from such facts and circumstances and occurrences that
the defendant indorsers rely on a special agreement, which
is in effect nothing more nor less than a guaranty that the
property, if sold, would bring an amount equal to or in
excess of the first note of the series. Before proceeding to

a statement of my findings of what occurred during the balance of the day after the defendant Huntley abruptly, if not rudely and insultingly, refused to indorse the three notes in question, let us ascertain what were the aims and purposes of all of the parties to the transaction.

It appears that prior to the execution of the mortgage by the Cheraw Ginning Company the defendant Huntley had already conveyed to the Ginning Company this land, for this had to be so in order for the Ginning Company to mortgage it; that the defendant indorsers were establishing a ginning enterprise and out of prudence, probably due to the high degree of solvency and corresponding degree of insolvency of those forming the corporation, had the business incorporated. I find that the season for ginning was rapidly approaching and that the defendant Lynch, who was to have the active management and control of this enterprise, presumably the only officer on a salary basis, was extremely anxious and hopeful of an early start for the fall business and for his job as manager of such enterprise. I find that the actual value of the land, without any further improvements or machinery, at this time was about $10,000 or $12,-000. The defendant company and the stockholders therein were anxious to finance their business and establish a connection with the plaintiff by a loan for $12,000. On the other hand, Mr. Cain of the plaintiff company had already stated, in effect, that the property was regarded by him as security for $8,000; this fact being drawn from Mr. Cain's conversation in July, 1919. The plaintiff corporation, which is a subsidiary of the Procter & Gamble Company, evidently had great demand for cotton seed, and was correspondingly anxious and desirous of forming this connection, if not establishing a branch at Cheraw, for the purpose of obtaining cotton seed on this market. They did subsequently have the defendant ginning company as their agent here for the purchase of cotton seed. They were, like the defendant Lynch, equally

anxious to get this enterprise started, and had sent Mr. Peeples down to secure the indorsements of the stockholders, even though the stockholders had inferentially refused to indorse by sending the first draft with the notes, unindorsed, attached thereto.  If Mr. Cain did not regard the property as security for more than $8,000, I infer that he did regard it as security for that amount, and Mr. Cain was the district manager of the plaintiff company, a position evidently higher in the scale than that held by Mr. Evans, and it would thus appear that the plaintiff would have loaned $8,000 on the property without indorsements even in July, 1919.   This, in effect, is what plaintiff is now seeking, to wit, that the first note for $4,000, being indorsed outside of and beyond the security to be applied to the other two notes representing the principal sum of $8,000, the question to be determined is, Who, if anybody, receded from his position?   Did the indorsers, in lieu of an indorsement on all of the notes, and in order to finance this enterprise, agree to become liable on note No. 1 outside of and beyond the security of the mortgage, and thereby did they recede from their position; or did the plaintiff corporation, in lieu of an indorsement on all the notes, and in order to make this alluring and promising connection, actually recede from their position and accept a guaranty that the property if sold would bring $4,000?

Now, taking up the negotiations from the ultimatum, or refusal, of the defendant Huntley, I find that on that day and subsequent to the said refusal, Mr. C. L. Prince, as attorney for the defendant company and for most, if not all, of the defendant stockholders, explained to his clients, that, under the agreement, by their indorsement on note No. 1, they were merely guaranteeing that the property, if sold, under foreclosure, would bring a sufficient amount to pay the said first note, and that the proceeds of sale would be first applied to the extinguishment of note No. 1 and then to the remaining notes *seriatim*.   I find that Mr. Peeples was

informed of this explanation, possibly at the time it was explained to the defendants, and also, certainly, that Mr. Prince did explain to Mr. Peeples very fully on this day the legal effect of the indorsement on note No. 1 under the agreement, such explanation being substantially and exactly as he had previously in the negotiations explained it to his clients. I find that this explanation was clearly made and should not have been misunderstood, misconstrued or misinterpreted by Mr. Peeples. Yet I cannot go so far as to actually find that Mr. Peeples explained to his superiors the position taken by the defendant indorsers and the basis upon which they would indorse note No. 1, though it was his duty to explain these things, and plaintiff is charged with the knowledge thereof; and from the happenings on that day, as disclosed by the testimony, I find that the defendants had a right to rely on Mr. Peeples to make known to the plaintiff company their attitude and the nature of their indorsement. At any rate, the turn in the negotiations looking to the indorsement of note No. 1 was made when Mr. Peeples was conducting the negotiations, and as a direct result of such negotiations all the papers, with only note No. 1 indorsed, were sent along with a draft for $12,000. The only way that plaintiff could know about such a proposal would be through Mr. Peeples, and certainly if the indorsements and draft were made in consequence of the negotiations by Mr. Peeples, then the plaintiff is charged with full knowledge of those negotiations.

It seems to me that the testimony overwhelmingly supports the contention of the defendants, to the effect that the indorsements on note No. 1 of the series were given as a guaranty or security that note No. 1 would be paid in full by the indorsers if the security, when properly applied, or rather when applied according to the explanation and understanding had between the parties at the time, failed to extinguish it. The defendants are all

gentlemen well known to the referee and of unimpeachable character and it is inconceivable to me that a tale so unanimously told could be, or would be, concocted by men of their standing. In addition to their own testimony, they are supported by the testimony of at least one disinterested witness, whose reputation for veracity and integrity is equally well known to this Court. It may be said at this point that I am convinced that the witnesses on both sides of this case are gentlemen of high standing and that each relates what he honestly believes to be the facts in the case. The plaintiff characterizes as an absurdity the proposition to indorse only the first note of the series under such conditions as are claimed by the defense, because they say that the property being valued at $8,000, as a minimum, the indorsement of the first note under such terms and conditions would have been no protection whatever to them and the acceptance of such an indorsement would have been an asinine performance on their part. The defendants with, it seems to me, equal propriety and equal logic, argue that having flatly refused to indorse all three notes and with the property valued at $8,000 as a minimum an indorsement of the first note as additional security would have been tantamount to doing what they had consistently and flatly refused to do, and would have been an equally inane and asinine performance on their part. It is true that the machinery mentioned in the mortgage was probably not considered in the determination of the value of the mortgaged property, that is, the real estate, and therefore plaintiff was getting that much additional security in its mortgage. It also appears that the defendant Lynch was very much in the good graces of the plaintiff corporation and they were anxious to have their friend, who had for years represented them in this vicinity, as manager of this new enterprise and thereby enable them to skim the cream, if possible, of all the seed business in this territory. Of course the testimony of Mr. B. F. Pegues is

not to be questioned, and I feel sure that he did on the 27th day of August, 1919, write a letter from Capt. Lynch to the plaintiff corporation in Charlotte, but I am constrained to believe that it was done by reason of the anxiety of Capt. Lynch, as manager of the Cheraw Ginning Company, to push the Charlotte office for action in the matter, and I have no idea that Capt. Lynch was acting as agent of the other defendant indorsers when he wrote that letter, because I apprehend that the motives leading to the incorporation of the defendant company were impelled by the desire to get away from individual liabilities caused by unauthorized acts of others; and that Capt Lynch, as such manager, was solicitous for fear the Buckeye people might fail to carry through the proposition submitted and explained in detail to Mr. Peeples.

Having found that the defendant indorsers refused to comply with the request of Mr. Peeples and indorse all three of the notes, did, at that time, propose an indorsement of note No. 1, and clearly explained their understanding of the extent of their liability in so doing; and having found that Capt. Lynch as a stockholder and salaried officer of the Cheraw Ginning Company, by his efforts consummated what had been commenced with Mr. Peeples, I feel bound to hold, as a matter of law, that, with the exception of Capt. Lynch, the defendant indorsers have maintained their contention as to the true agreement between the parties. As to Capt. Lynch, I find that from his negotiations with Mr. Evans, had after Mr. Peeples left Cheraw, he was advised, in effect, through Mr. Evans, that the Buckeye people did not understand the liability of the indorsers to be that which had theretofore been explained to and understood by Mr. Peeples, and therefore Capt. Lynch would be estopped from charging the Buckeye people with a knowledge of the explanation and understanding had with their agent, Mr. Peeples.

Wherefore, I recommend (1) that the plaintiff have judgment against the Cheraw Ginning Company for the amount found to be due upon the notes set out in the complaint herein, which is, on the first note, $4,000, principal, $1,023.10, interest from May 1, 1920 (interest having been paid on this note up to this date), and $502.30, attorney's fees; on the second note, the sum of $4,000, principal, $1,-503.12, interest from August 21, 1919, and $550.30 as attorney's fees; on the third note, the sum of $4,000, principal, $1,503.12, interest from August 21, 1919, and $550.30 as attorney's fees; (2) that plaintiff have judgment of foreclosure and sale of the mortgaged property and that the proceeds of sale be applied to the judgment debt, including interest and attorney's fes: (3) that in case the proceeds of sale, after proper deductions for costs, disbursements, etc., should be insufficient to satisfy the first note, plaintiff have judgment against the defendants C. S. Lynch, P. B. Huntley, E. W. Laney, P. J. Wililams, and G. W. Duvall for any such deficit; and (4) that, if the proceeds of sale be insufficient to pay the entire debt, interest, and attorney's fees, the plaintiff have judgment against the Cheraw Ginning Company and C. S. Lynch for such deficit.

### ORDER UPON REPORT OF SPECIAL REFEREE

I have found great difficulty in getting to write out an opinion in this case, it was marked "heard" while I was on circuit at Chesterfield, and argued before me at Charleston, some time ago, and I have had to keep it under advisement much longer than I usually do, so many other matters coming up here in which prompt decision was important. I have, however, studied this case carefully, over and over again, and my conclusions upon first impression have never changed.

It is, I think, useless for me to set out the details of the controversy; that is all well done in the report of the referee, and in the written arguments which have been sub-

mitted.   No doubt an apepal would be taken whichever way the decision might be on circiut and the Supreme Court will have the whole case before it with this decision, and the argument besides.

In the argument of Pegues & Murray, for plaintiff, I find this statement which I adopt:  "As to what happened after Mr. Peeples came to Cheraw, the witnesses for the plaintiff and the witnesses for the defendants are at variance.   The events happened over four years ago, and most of the witnesses, testifying from memory, serve to show the frailty and ofttimes unreliability of human memory.   It is simply a case of honest men striving to recall a series of events and happenings occurring more than four years before."

I also adopt all that the referee writes in his report along this line.   I agree with the referee also in taking and considering all of the testimony reported, as each side relies upon a different verbal understanding contemporaneous with the transaction, plaintiff claiming that the agreement was that the indorsement of the first note was an additional security, and defendants claiming it was a guaranty that the property would bring at least $4,000, the amount of the first note.

I differ absolutely from the referee in his conclusions, from the testimony as to the agreement.   All persons agree that the plaintiff wanted all of the notes indorsed, that the same was refused, and that an "impasse" had been reached in the negotiations for the loan, and that the matter could go no further without a compromise, and that, nevertheless, it did go to a conclusion.

I find from the testimony in the light of all the circumstances and intrinsic probabilities of the situation that to adopt the view of contesting defendants that the indorsement was to guarantee that the property would bring $4,-000 obtained as no change whatsoever towards plaintiff's position.   It valued the property at $8,000, and had refused

the loan of $12,000 unless all the notes were indorsed.  It is not reasonable to find that it would have changed and made the loan of $12,000, on the idea (which added nothing to the security) that the property would bring $4,000.

The natural idea would be that the "impasse" was broken, as I find from the testimony it was, by the plaintiff yielding its claim for indorsement of all the notes, and defendants yielding their claim for not indorsing any of them by indorsing the first note as additional security to the $8,000 of property.

This idea has many corroborations and circumstances supporting it.  Lynch, one of the indorsers, expressed his understanding that way almost contemporaneously by correspondence.  Duvall took an indemnity bond, etc., correspondence and dates show that recollection for defendants was at fault in many details, why not, honestly, then, also as to the contemporaneous idea of a meaningless agreement that it was explained and understood that property would bring $4,000?

It is easy to realize how, when in wracking the memory over four years, this idea, once suggesting itself, caught the fancy and gave "to airy nothing a local habitation and a name."

The plaintiff's version is made out by the greater weight of the testimony.  In my opinion there must therefore be a decree and judgment in favor of plaintiff against the indorsers for the amount due upon the first note, interest, and attorney's fees; for the foreclosure of the mortgage on the gin property, both real and personal; and that the proceeds of sale of the mortgaged property be applied first to the two notes which are not indorsed; that after the five indorsers are held liable for the payment of the first note; that they be subrogated to the rights of plaintiff in the mortgage, and be entitled to any equity over and above the payment in full of the second and third notes, which are not indorsed.

Let a formal decree be taken upon the footing of this decision, and for carrying out the same in detail.

And it is so ordered, adjudged, and decreed.

*Mr. S. S. Tison,* for appellant, cites: *Parol testimony admissible to prove an agreement other than imported by a blank endorsement:* 3 R. C. L., 1157. *Cases distingushed:* 74 S. C., 368; 20 S. E., 940. *As between assignees of various notes secured by a mortgage there are no priorities:* 32 S. C., 351.

*Messrs. Pegues & Murray,* for respondent, cite: *Burden on appellant to show that findings of Circuit Judge against preponderance of evidence:* 122 S. C., 499; Id., 238; 108 S. C., 27. *Holder of different notes secured by deed of trust may apply entire proceeds of the sale under the deed to the note last maturing; not prevented thereby from obtaining judgment against a surety on note first falling due, and which was only note endorsed:* 20 S. E., 940. *Where referee and Circuit Judge differ as to their conclusions on questions of fact, latter regarded as prima facie right:* 44 S. C., 430.

October 28, 1927.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The facts in this case are stated in the report of the special referee. The plaintiff and the defendant, C. S. Lynch, filed exceptions to the referee's report, and the Circuit Judge, by his decree, overruled the referee's conclusions. Let the report of the referee and the decree be reported. From the decree on circuit, the defendants appeal to this Court upon exceptions which put in issue the conclusions of the Circuit Judge as to the rights and liabilities of the parties.

At the trial of the case both parties submitted oral testimony as to alleged parol contemporaneous agreements regarding the indorsement of the first note

of the series by certain defendants. We think that such testimony was not properly admissible, as it tended to vary the terms of a written contract; but, as it was not objected to at the trial, and is not the subject of exception in this Court, it must be considered in reaching a conclusion in the case.

The whole matter is practically reduced to a question of the weight of the testimony adduced by the respective parties, and, while we do not agree with all that was said by the special referee in his report, we do agree with his findings as to the weight of the testimony and with his recommendations in view of such findings. We therefore adopt his conclusions as the judgment of this Court.

The judgment of the Circuit Court is reversed, and the case remanded to that Court for proceedings not inconsistent with this opinion.

MR. CHIEF JUSTICE WATTS and MR. JUSTICE STABLER concur.

MR. JUSTICE COTHRAN (dissenting) : I think that the decree of his Honor, Judge Memminger, should be affirmed, and therefore respectfully dissent from the contrary conclusion announced in the opinion of Mr. Justice Blease, for the reasons which follow.

This is an action to foreclose a certain mortgage executed by the defendant Cheraw Ginning Company to the plaintiff, Buckeye Oil Company, covering certain real estate and ginning machinery located in the Town of Cheraw, to secure the payment of three notes of $4,000 each, dated August 21, 1919, and due, respectively, in one, two, and three years from date. The controversy is as to the liability of the indorsers upon the first of these notes, the appellants P. B. Huntley, C. S. Lynch, P. J. Williams, E. W. Laney, and G. W. Duvall.

The facts of the case appear to be as follows: In July, 1919, the five gentlemen whose names appear as indorsers upon the first note for $4,000, dated August 21, 1919, and

due August 21, 1920, united to establish a ginnery in the Town of Cheraw, upon a lot which belonged to one of them, P. B. Huntley.   A corporation was organized under the name of Cheraw Ginning Company, they being the stockholders.   The plaintiff, Buckeye Cotton Oil Company, was at the time a corporation located in Charlotte, N. C.   It was a subsidiary corporation of Procter & Gamble Company, extensive dealers in and consumers of cotton seed oil.

The Cheraw Ginning Company applied to the Buckeye Cotton Oil Company for a loan of $12,000, with which to organize and install the ginnery.   The representative of the Buckeye Company appraised the property of the Cheraw Company at $8,000, and declined to lend more than that amount upon the notes of the Cheraw Company secured by a mortgage of the plant.   After some negotiations, the Cheraw Company appears to have labored under the impression that the Buckeye Company had agreed to lend $12,000 upon that security, and prepared and executed notes and mortgage accordingly, and drew upon the Buckeye Company for the amount, transmitting the notes and mortgage.   Upon presentation of the draft, the Buckeye Company declined to honor it, upon the ground that the notes had not been indorsed by the directors, the gentlemen named. A conference was then held, about August 21, 1919, at Cheraw, between the gentlemen and one Peeples, a representative of the Buckeye Company.   He insisted that the notes be indorsed by the directors; they refused and the conference broke up.   Later in the day it was proposed by the directors that they indorse the note due August 21, 1920. Peeples declined to close the matter upon those terms without authority from the Charlotte office.   The parties are sharply at variance as to what happened thereafter, and particularly as to the conditions upon which the indorsements were made upon the first note.   The defendants con-

tend, and offered parol evidence to show, that after they made the proposition to indorse only the one note, Peeples left the bank where the conferences had been held, for the avowed purpose of communicating by telephone with the Charlotte office in reference to the proposition which had been made; that in about an hour and a half Peeples returned, accepted the proposition, and the transaction was closed by the delivery to him of the three notes and mortgage, the first being indorsed by the defendants; that the draft of $12,000 was thereafter paid in due course. The defendants also offered parol evidence to show that their indorsement of the first note was specifically stated and agreed to have been made simply as a guaranty that the property would bring at foreclosure sale at least $4,000; that their liability as indorsers should be limited to that extent.

The plaintiff, on the other hand, contends, and offered parol evidence to show, that no such agreement limiting the effect of the indorsements on the first note was entered into; on the contrary, that it had in the first instance refused to advance more than $8,000 upon the security of the property, and had insisted that, if $12,000 was to be advanced, the defendants must indorse all three of the $4,000 notes; that it was finally agreed that $12,000 would be advanced upon the condition that the defendants would indorse the first note, which should be considered as additional security to the mortgage upon the property, evidently intending that, if the first note should be paid at maturity, the plaintiff was willing to risk the security of the property for the other two notes.

The record is singularly barren of dates. The date of the commencement of the action does not appear, nor the date of the order of reference, nor of the taking of testimony, nor of the hearing before the Circuit Judge, nor of the order or sale for foreclosure.

It appears that the case was referred to L. C. Wannamaker, Esq., as special referee.   He filed a report dated April 12, 1924, holding that the defense of all the defendants, except C. S. Lynch, had been sustained; that the plaintiff was entitled to judgment against the defendant corporation upon all of the notes and for foreclosure of the mortgage; that, in case the proceeds of sale should be insufficient to satisfy *the first note,* the plaintiff have judgment against all of the individual defendants, except C. S. Lynch, for the deficiency; and that, if the proceeds should be insufficient to pay *the entire debt,* the plaintiff have judgment against the corporation and Lynch for the deficiency.

Exceptions to this report were heard by his Honor, Judge Memminger, who filed a decree dated July 5, 1924, reversing the conclusions of the special referee, holding that the indorsement of the first note was intended as additional security to the mortgage, and rendering judgment against all of the indorsers for the amount of the first note, with interest and attorney's fees; ordering foreclosure and sale; directing that the proceeds of sale be applied first to the two unindorsed notes; and providing that, after payment of the first note by the indorsers, they be subrogated to the rights of the plaintiff in the surplus, if any, remaining after payment of the second and third notes.   From this decree the defendants, indorsers, have appealed.

At a time not stated in the record, but presumably after the decree of Judge Memminger, which is dated July 5, 1924, the sale under foreclosure was had, at which the property was bid in by the plaintiff for $8,000.   I assume that the plaintiff has complied with its bid and received titles to the property, although it is not so stated in the record for appeal.

The matter of controversy upon this appeal is the application of the proceeds of sale—whether the plaintiff is entitled to have those proceeds, which are insufficient to fully dis-

charge the second and third notes, applied to those two notes, leaving the first note entirely unpaid, and to enter up judgment against the indorsers of that note for the amount of it, with interest and attorney's fees, or whether the defendants are entitled to have those proceeds, which are sufficient to discharge the first note, applied to that note, in discharge of the liability of the indorsers.

This case exemplifies the wisdom of the rule of law which excludes parol evidence varying the terms of a written instrument. The individual defendants and their attorney, men of the very highest probity of character, testify to the circumstances attending the indorsement of the note, and in the most positive and detailed manner sustain the contention of the defendants, that it was intended only to guarantee that the property mortgaged at foreclosure sale would bring at least the amount of the note which they indorsed, $4,000.

Opposed to their statements, the plaintiff urges the lapse of four years' time, the uncertainty and fallibility of human memory, the changed conditions when flattering prospects have been rudely shattered, the unreasonableness of the acceptance by the plaintiff of a proposition which added nothing of security to the notes, and the positive testimony of equally credible witnesses that the expressed intention of the indorsement was to add security to that supplied by the mortgage.

I think that, if objection had been interposed to the parol evidence offered by the defendants, to show that the indorsement was not what it legally imported to be, the evidence should have been excluded.

Assuming that the defendants were accommodation indorsers (*Bank v. Ashley Corp.,* 133 S. C., 304; 130 S. E., 890. *Bank v. Bickel* [Ky.], 137 S. W., 790), the extent of their legal liability is fixed by the Negotiable Instruments Law, Vol. 3, Code of 1922, § 3717:

"Every indorser * * * engages that on due presentment, it [the instrument] shall be accepted or paid, or both,

as the case may be, according to its tenor; and that if it be dishonored, and the necessary proceedings on dishonor be duly taken, he will pay the amount thereof to the holder. * * * "

The proffered evidence tended to establish an entirely different obligation upon the indorsers—an obligation not to do what the law imposed upon them, but to be responsible only upon the happening of a totally different event, the sale of the property for less than $4,000.

Prior to the passage of the Negotiable Instruments Law, it was held in many cases, some of which are cited in the report of the special referee, that the obligation of an indorser in blank was one *implied* by the law, and that a different one could be established by parol evidence. But since the passage of that law the obligation is *express* and not *implied,* and becomes a part of the instrument, as much so as if it had been written above the signature of the indorser. And I think without exception the Courts have so construed the Negotiable Instruments Law. See 1 Daniel Neg. Inst. (5th Ed.), § 717. Extended note to the case of *Hawkins v. Shields* (Miss.), 4 A. L. R., 760, particularly at page 802. *Bank v. Commercial Co.,* 163 Wis., 470; 157 N. W., 510. *Interstate Co. v. Bank,* 67 Colo., 6; 185 P., 260; 10 A. L. R., 705. *Cole v. George,* 86 W. Va., 346; 103 S. E., 201. *Smith v. Brabham,* 48 S. C., 337; 26 S. E., 651.

The evidence upon this issue in behalf of the defendants was received without objection. The evidence in behalf of the plaintiff tended to show that at the first the plaintiff declined to advance as much as $12,000; that in its judgment an advance of $8,000 was as much as the security offered would carry; that when the three notes of $4,000 each, with the mortgage, were forwarded to the plaintiff in Charlotte, and a draft or $12,000 was drawn upon it, the plaintiff declined to honor the draft, unless the three notes should be indorsed by the directors of the corporation, and returned

the notes and mortgage to them; that in the conference which ensued it was agreed that the advance would be made if the directors would indorse the $4,000 note which first matured, August 21, 1920, with the distinct understanding and agreement that the indorsement of this note should be additional security, cumulative to the security afforded by the mortgage upon the property.

The difficult question suggests itself, whether this evidence, on the part of the plaintiff, was admissible under the parol evidence rule. As with the evidence offered by the defendants, tending to show a conditional indorsement, no objection was interposed by the opposing party to its admission. If no parol evidence had been offered by either party, or if such evidence had been excluded on both sides, and nothing appeared but the mortgage securing three notes, one of which was indorsed by accommodation indorsers, I do not think that there could arise a doubt but that, upon a sale under foreclosure proceedings, the net proceeds of the sale would have been application *pro rata* to all of the notes.

"When several debts are secured by a mortgage, for some of which debts there are sureties who are not parties to the mortgage, the mortgagee becomes the trustee for the sureties to the amount of the funds thus provided for their indemnity; and upon a sale of the mortgaged property, the mortgagee must see that their just proportion of the proceeds of the sale is applied to the discharge of the debt on which the sureties are bound." *Fielder v. Varner,* 45 Ala., 429.

"Where a mortgagor, liable to the mortgagee on one note as surety, and on another as principal, with others as his sureties, executes a mortgage for the amount of both notes, to secure all of his indebtedness to the mortgagee, the proceeds of the sale on foreclosure should be applied to the discharge of both notes *pro rata.*" Bank v. Moore, 112 N. Y., 543; 20 N. E., 357; 3 L. R. A., 302; 8 Am. St. Rep., 775.

"One who forecloses a mortgage held by him to secure several debts, on some of which a surety is bound, while on others he is not, is, there being no special equities in the case, is not obliged to apply the proceeds to the payment of the secured rather than of the unsecured debts." *Wilson v. Allen,* 11 Or., 154; 2 P., 91.

"Where a deed is executed, conveying an estate for the security of notes indorsed by different individuals, a Court of chancery, at the instance of any of the indorsers, will compel a *pro rata* distribution of the proceeds of the trust sale." *McDermott v. Bank,* 9 Humph. (28 Tenn.), 123.

In 2 Jones, Mtg. (6th Ed.), § 1706, it is said:

"Where the mortgage secures several debts, for some of which there are sureties who are not parties to the mortgage, the mortgagee becomes a trustee for the sureties to the amount of the funds thus provided for their indemnity, and he must see that the proceeds of a sale of the property are applied in just proportions to the discharge of the debts on which the sureties are bound. Neither the mortgagor nor the mortgagee will be allowed to defeat the rights of the sureties, who have a right to be indemnified out of the property."

So that, as an incident of the obligation of the indorsers coupled with the mortgage, a right which inured to them as an incident of the relation, in the absence of a valid agreement affecting it, the indorsers were entitled to a *pro rata* distribution of the proceeds of the foreclosure sale. The necessary effect of the parol evidence offered by the plaintiff, if it establishes the agreement contended for, would be to establish a waiver or an abandonment of that right; and the question is, Can that agreement be established by parol evidence?

It is my opinion that it cannot, as being in violation of the same rule which would have excluded the parol testimony of the defendants.

"The legal effect of a written instrument, even though not apparent from the terms of the instrument itself, *but left to be implied by law,* can no more be contradicted, explained, or controlled by parol or extrinsic evidence than if such effect had been expressed."   22 C. J., 1075.

In Page, Const., § 1189, it is said:

"The rule that prior or contemporaneous negotiations cannot be used to contradict, add to, or otherwise vary a written contract applies not merely to the letter of the written contract, *but also to its legal effect."*

In *Colt v. Hallman,* 118 S. C., 404; 110 S. E., 462, the Court said:

"The contract is silent as to the time within which the shipment was to be made, which gave the seller the right to ship within a reasonable time, and parol testimony inconsistent with this right to prove a contract for immediate shipment was improperly received."

See, also, *Oxweld v. Davis,* 115 S. C., 426; 106 S. E., 157.

"And parol testimony is just as inadmissible to contradict an implied term of a written contract as an express term thereof."   In re Clairfield Lumber Co. (D. C.), 194 F., 181.

"Verbal agreements, however, between the parties to a written contract, made before or at the time of the execution of the contract, are in general inadmissible to contradict or vary its terms or to affect its *construction,* as all such verbal agreements are considered as merged in the written contract."   The Delaware, 14 Wall, 579; 20 L. E., 779.

In *La Farge v. Rickert,* 5 Wend. (N. Y.), 187; 21 Am. Dec., 209, the Court said:

"A written contract cannot be varied by parol; and where the *legal construction and effect* of an instrument are well settled, it is varying the instrument to show that the parties intended something else, as much as it would be to prove that the terms used were not in accordance with the previous agreement."

In *Rector v. Bernaschina,* 64 Ark., 650; 44 S. W.; 222, the Court said:

"The rule which prohibits any party from varying, qualifying, contradicting, adding to, or subtracting from, a written contract, by parol evidence of a different understanding or intention, entertained at the time the writing was executed, 'precludes the varying of its legal import by the like evidence.' "

In *Peterson v. Chaix,* 5 Cal. App., 525; 90 P., 948, it is held (quoting syllabus):

"Whatever the law implies from a contract in writing is as much a part of the contract as that which is therein expressed; and to the extent that the contract, with that which the law implies, is clear and complete, it cannot be varied as added to by extrinsic evidence."

At least 100 cases cited by C. J., 1075, are to the same effect.

Mr. Wigmore suggests that, under certain circumstances, extrinsic evidence of an agreement affecting certain aspects of a strictly negotiable instrument, as between the parties thereto, may be resorted to. Sections 2443, 2444, 2445. However that may be, while the note in question is a negotiable instrument, the incidental right of the indorsers to a distribution *pro rata* of the proceeds of the sale emanates from the fact that the notes are secured by a mortgage—both must be taken together as the source of the right.

My opinion, therefore, is that the testimony of both parties, that of the defendants to alter the terms of the indorsement and that of the plaintiff to alter the legal effect of it, was inadmissible and should have been excluded. The legal effect of allowing it to be admitted, presents an interesting situation.

The fundamental error, as I view it, in the leading opinion, appears in the following statement:

"At the trial of the case both parties submitted oral testimony as to the alleged parol contemporaneous agreements

regarding the indorsement of the first note of the series by certain defendants. We think that such testimony was not properly admissible, as it tended to vary the terms of a written contract; *but as it was not objected to at the trial, and is not the subject of exception in this Court, it must be considered in reaching a conclusion in the case."* (Italics added.)

The general rule, of course, is familiar, that inadmissible evidence received without objection becomes a part of the trial of the issues, and may be considered by the Court or jury. The rule, however, relates only to *secondary* evidence, and goes only to the *form* in which the evidence may be introduced.

What is commonly termed the "Parol Evidence Rule" *is really not a rule of evidence at all;* it is a *rule of substantive law,* that a written instrument cannot be varied by a prior or contemporaneous verbal agreement; and, although actually received as a part of the evidence in the case, the trial Court is powerless to give it effect in contravention of the rule of substantive law. Speaking of it, Mr. Wigmore says:

"In the first place, *it is not a rule of evidence* because it has nothing to do with the probative value of one fact as persuading us of the probable evidence of another fact. It is *a rule of substantive law,* because it deals with the question where and in what sources and materials are to be found the terms of a legal act." 4 Wigmore, Evidence (1st Ed.), § 2425.

In *Dollar v. Corporation,* 13 Cal. App., 331; 109 P., 499, it is held (quoting syllabus):

"The proposition that in the absence of objection secondary evidence is sufficient to support findings based thereon does not apply to the use of parol evidence to vary a written instrument, since whether a contract in writing may be varied by parol is a question of substantive law, while the question of admission or rejection of secondary evidence

is governed by the rules of evidence," citing 1 Greenleaf, Evidence (16th Ed.), § 305a.

In the case last cited the question arose upon a petition for a rehearing. The petitioner assigned error in the opinion which had been filed, containing this statement:

"No objection was made to the introduction of this testimony [certain parol evidence tending to vary the terms of a written instrument], *but the incompetency of parol evidence to vary a writing may be considered as a matter of law.*"

In disposing of the assigned error, the Court said:

"In support of the contention that this is not a correct declaration of the law, a number of cases are cited to sustain the proposition that, in the absence of objection, secondary evidence is sufficient to support the findings of a Court based thereon. The rule declared by this Court is entirely distinct from that applied in those cases. Whether or not a contract in writing may be varied by parol evidence is a question of substantitive law, while the admission or rejection of secondary evidence is governed by the rules of evidence. 1 Greenleaf on Evidence (16th Ed.), § 305a. Where a contract is reduced to writing, whether required by law to be written or not, the writing supersedes all other negotiations and stipulations concerning the matter made at the time or prior thereto. Civ. Code, § 1625. If the terms as agreed upon have not all been reduced to writing, these can be supplied only by an appropriate proceeding, or under proper allegations. Section 1856, Code Civ. Proc. * * * By way of illustration of the distinction between the rule declared by this Court and that cited by appellant, it may be said that parol or secondary evidence, unobjected to, might supply the terms or purport of a contract which had been reduced to writing, and, in this form, furnish sufficient proof to sustain a finding; *but parol evidence would neither be admissible to vary this contract, nor, if admitted without objection, be sufficient to support a finding which was in conflict with or which in any manner varied the original written contract*

*which the parties entered into.* The purpose of the rule relating to the varying of a writing by parol evidence is to prohibit this from being done, while the rule relating to the admission of secondary evidence goes only to the form in which the evidence may be introduced. These rules are in no way inconsistent, and the rule as to secondary evidence is not applicable here."

In *Pitcairn v. Hiss Co.* (C. C. A.), 125 F., 110, the syllabus is as follows:

"The fact that parol evidence to modify a written contract was introduced without objection in an action on such contract does not affect the right and duty of the Court in instructing the jury to pass upon the competency and legal effect of such evidence, especially in a Federal Court, where it is the settled rule that a written contract cannot be reformed in an action at law."

In the opinion the Court declares:

"According to the modern and better view, the rule which prohibits the modification of a written contract by parol is a rule, not of evidence, but of substantive law. 21 A. & E. Enc. Law (2d Ed.), 1079. Thayer's Evidence, p. 390 et seq.; 1 Greenleaf, Evidence (16th Ed.), § 350a. Parol proof is excluded, not because it is lacking in evidentiary value, but because the law for some substantive reason declares that what is sought to be proved by it (being outside the writing by which the parties have undertaken to be bound), shall not be shown. Where, by statute, a writing is required either to create an obligation or to effect a result, as in the case of deeds and wills, or of contracts within the statute of frauds, it is readily understood that it is the writing alone that is to speak; but this is equally true of contracts which by the convention of the parties have assumed a similar form. The writing is the contractual act, of which that which is extrinsic, whether resting in parol or in other writings, forms no part. If through fraud, accident, or

mistake, it fails to express the contract as it was intended to be made, equity will reform it upon proper proof. But still it is the writing as corrected that is the measure of the parties' undertaking, and they cannot be otherwise held."

Further the Court declared:

"It is contended by the defendant that, as the evidence referred to was before the jury without objection, it could not be withdrawn from their consideration, and should have been submitted to them in the way requested. But to this we cannot agree. Notwithstanding its admission, it was still for the Court to declare what, as a matter of law, was the contract between the parties—whether it was to be confined to that which was expressed in the writings, or could be extended to the verbal assurances alleged to have been given outside of them. *This did not depend on how the evidence came in—whether with or without objection;* it still devolved on the Court, instructing the jury, to pass upon its competency and legal effect, and that is all that was done in the ruling complained of. The Court simply held that the writings were to be taken as constituting the agreement, and that extrinsic evidence could not be resorted to, to modify it. * * * Unless, therefore, the rule which prohibits the introduction of extrinsic evidence is to be disregarded, the writings must be taken as expressing the contract between the parties, and there was no waiver by the plaintiffs of their right to adhere to them, and to have the case determined thereby, merely because parol evidence as to what passed outside of them was permitted to come in. The competency of this evidence, as a matter of law, to affect the writings, was not necessarily conceded by the failure to object at the time."

In *Morrison v. Riley* (Tex. Civ. App.), 198 S. W., 1031, the syllabus is as follows:

"The rule that the terms of a written instrument cannot be varied by parol is a substantive law, and not merely a rule of evidence, and the legal effect cannot be avoided even

though proof of parol agreements be admitted without objection."

In the opinion the Court declares:

"But it is clear to us that the parol agreement relied on in this case could not be given effect, since it is in plain contravention of a stipulation contained in plaintiff's mortgage that the property thereby pledged should be free from all other mortgages and incumbrances whatsoever. We have examined several of the authorities cited by the author to support the text quoted above, and in none of them which we have examined is there any indication that the rule announced would be applicable whenever to do so would be to override and set at naught the other well-established rule that, as between the parties thereto, a legally binding written instrument, which is unambiguous in its terms, cannot be varied, added to, or contradicted by proof of prior or contemporaneous agreements. The latter rule is a rule of substantive law, and not merely a rule of evidence, and the legal effect of the written instrument cannot be avoided, even though proof of such parol agreement be admitted without objection, since such parol proof is incompetent to accomplish that result. 4 Wigmore on Evidence, §§ 2400, 2425, 2446; 3 Jones on Evidence, §§ 434, 435; 10 R. C. L., pp. 1017, 1018; 1 Greenleaf on Evidence, § 275; 17 Cyc., 570; *Henry v. Phillips,* 105 Tex., 459; 151 S. W., 537. *Rubrecht v. Powers,* 1 Tex. Civ. App., 282; 21 S. W., 318."

In the case of *Shropshire v. Bank* (Tex. Civ. App.), 196 S. W., 977, the Court said:

"The rule that parol testimony is not admissible to vary, change, or add to a written instrument is one of substantive law, and not a mere rule of evidence, and testimony introduced in violation of that rule, even in the absence of objection thereto, can be given no legal effect."

"The rule which prevents the varying of a written instrument by parol evidence denies such an effect to parol evi-

dence even when such evidence is properly in the record." *Muller v. Bernstein,* 198 Ill. App., 104.

In *American Co. v. Railroad Co.,* 41 N. D., 381; 170 N. W., 568, the syllabus is:

"While the failure to object may be a waiver of the incompetency of evidence, it is not a waiver of the right to question its legal effect or its legal sufficiency."

In the opinion the Court declares:

"Plaintiff contends that, inasmuch as there was no objection to Wright's testimony when it was offered, it became competent evidence, and must be so considered. The rule sought to be invoked is well established, but it does not go to the extent contended for by plaintiff. While the failure to object may constitute waiver of the incompetency of the evidence, 'it is not a waiver of the right to question its legal effect or its legal sufficiency.'"

"The 'parol evidence rule' is a rule of substantive law, because it deals with the question of where and in what sources and materials are to be found the terms of a legal act." *Milton v. Burton,* 79 Fla., 266; 84 So., 147.

"While the rule known as the parol evidence rule is usually referred to as a rule of evidence, it is more properly a rule of substantive law, since it is a rule of substantive law and not any rule relating to the admissibility of evidence that gives the rule effect." *Andersonian Co. v. Wade,* 108 *Wash.,* 373; 184 P., 327.

"Parol evidence, contradicting chattel mortgage, cannot vary it, even though admitted without objection." South *Texas Implement & Machine Co. v. Anahuac Canal Co.,* (Tex. Com. App.), 280 S. W., 521.

"Court can disregard parol evidence, admitted without objection, to vary terms of unconditional promissory note, on subsequent motion by holder to direct verdict." *Bushnell v. Elkins,* 34 Wyo., 495; 245 P., 304.

"Incompetent evidence admitted without objection becomes evidence in case and has probative effect subject to exception in case of parol evidence which, though admitted without objection, cannot have effect of varying written instrument." *Gethins v. Breeyear,* 252 Mass., 326; 147 N. E., 876.

"Oral agreement, entered into at the time of or prior to the execution of a note, that it should not become payable until demand, was not admissible to vary express written promise in the note to pay 'one day after date, without grace,' * * * and such rule is not one merely of evidence, but of substantive law, and it is immaterial that some evidence relating to the oral understanding was not specifically objected to." *Rottman v. Hevener,* 54 Cal. App., 474; 202 P., 329.

"Parol evidence, though admitted without objection to prove reservation of underground passageway from railroad right of way deed, is without probative force, and insufficient to support verdict or finding." *Railroad Co. v. Wiseman* (Tex. Civ. App.), 247 S. W., 695.

"Although oral evidence may be admitted without objection, it should not be permitted to work an alteration of a written contract between the parties." 10 R. C. L., 1017.

In *Butterick Pub. Co. v. Fisher,* 203 Mass., 122; 89 N. E., 189; 133 Am. St. Rep., 283, it is held:

"Parol evidence to place upon one of the parties to a contract a greater burden than was imposed by such contract, though admitted without objection, cannot have the effect of changing a contract in writing."

"The rule that incompetent evidence, admitted without objection, is to have its probative effect, had no application to the admission of oral evidence that the parties to a written lease understood the premises were to be used for the sale of liquor, which became unlawful before the expiration of the lease, where the lease was not ambiguous, and con-

tained no reference to the character of the business to be conducted." *Robbins v. McCabe*, 239 Mass., 275; 131 N. E., 799.

"In action on written contract of guaranty of the payment of a dividend on corporate stock, the parties were bound by the contract as written, though parol evidence was admitted without objection." *Creighton v. Elwell*, 243 Mass., 580; 137 N. E., 737 (syllabus).

In the opinion, it is said:

"The agreement was in writing and its construction was for the Court. The parties are bound by the contract as written; this rule is not affected by the fact that parol evidence was admitted without objection."

In *De Pasquale v. Bradlee* (Mass.), 156 N. E., 37, the syllabus reads:

"The terms of a written instrument cannot be varied by parol evidence, though put in by both parties; Court in such case being still required to consider its legal effect."

In the opinion the Court declares:

"The evidence should not have been received, and the case stands before this Court with such evidence disregarded and as if stricken from the record."

The case should have been decided, therefore, in total disregard of the oral evidence of both parties tending to vary the terms of the written contract between them, evidenced by the indorsement of the first $4,000 note, notwithstanding the fact that such evidence, on both sides, was admitted without objection.

The exclusion of consideration of the defendant's evidence that their indorsement was qualified and limited as above indicated, fixes liability upon them under the simple law of indorsements. The exclusion of consideration of the plaintiff's evidence that the note was executed as additional security to the real estate mortgage remits the plaintiff to its strict legal rights under the written instrument, subject

to the right of the indorsers to a *pro rata* application of the proceeds of the sale to the $4,000 note.

If the points herein discussed had been made in the Court below, or by exceptions to the decree of Judge Memminger, I think that the judgment should have been modified by requiring the application of the proceeds of the sale to the three notes *pro rata*.   But they were not made, and I have sought in vain to find an exception which would justify this Court, as an appellate tribunal, in thus solving the issues between the parties.   They have pitched their fight upon a different battle ground, and the affirmance of the circuit decree seems to me·inevitable.

It may be suggested that the points upon which my conclusions have been reached were not presented upon the trial of this case nor upon the appeal.   This is true; but it must be remembered that the defendants are appealing from the decree of the Circuit Judge upon the ground of error in deciding that, *upon the evidence,* no such agreement as they allege had been established.   They propose now that the decree be reversed upon a consideration of that evidence which in my opinion was inadmissible.   As I have endeavored to show, the *absolute impotency* of the Court to violate the rule that parol evidence cannot be received *or considered,* where it tends to vary the terms of a written instrument, cannot be converted into *positive power,* by the admission of such evidence without objection.

But assume that all I have written must be consigned to "the port of missing traders," and that the case is to be decided upon the *admittedly inadmissible evidence* on both sides, I think that his Honor, Judge Memminger, correctly decided the questions of fact before him.   His decree, in my opinion, is unanswerable.   The property was valued at $8,-000; upon that security the plaintiff declined to loan $12,-000, naturally, unless the directors would personally guarantee by indorsement the note of the corporation; the directors declined to do so, but agreed to indorse the note first falling

due which was done.    They now claim that their indorsement was qualified by the condition that the property valued at $8,000 would bring $4,000 at foreclosure sale.    What security that added to the mortgage for $12,000 it is impossible to conceive.    Of course, the property would bring $4,000; the plaintiff would make it bring that much.    So the indorsement, accepting the version of the defendants, amounted absolutely to nothing.

· I have no intention to reflect in the slightest degree upon the worthy gentlemen who have endeavored to sustain this theory, and who honestly have entertained and testified to this version of the transaction; but the inherent improbability of it leads me to the conclusion that they, like hundreds of other honest and worthy men, have been mistaken in their recollection.    I have not a doubt but that the indorsement was intended as additional security to that afforded by the mortgage.

## ON PETITION FOR REHEARING

P. A. Murray, Jr., of Cheraw, for petitioner.

Per Curiam.    Petition refused.    Rehearing denied.

MR. JUSTICE COTHRAN (dissenting from dismissal of petition):    It is conceded that the parol evidence to establish a conditional indorsement of the note was inadmissible.    I still think that, notwithstanding the fact that it may have been received without objection, the Court not only was *under no compulsion* to consider it, but that it *had no power to do so.*