(No. 6394. October 28, 1937.)

ELIZA EVANS, Respondent, v. DAN J. CAVANAGH and STATE INSURANCE FUND, Appellants.

[73 Pac. (2d) 83.]

Carroll F. Zapp, for Appellants.

John W. Clark, D. W. Thomas and Jones, Pomeroy & Jones, for Respondent.

MORGAN, C. J.—The evidence shows, and the industrial accident board found, among other facts, that D. P. Evans, now deceased, was by trade and general occupation a watch repairer; that his height was about five feet five and a half inches and his ordinary weight about two hundred thirty pounds; that he was very fleshy, was thick chested and his abdomen was

very thick and fat; that October 10, 1934, he was forty-eight years old; that so far as his wife, respondent above named, knew he was in good health; that during the time of the World War he had influenza, the only sickness he ever had which she remembered; that when working he was a handy man, reasonably fast and worked hard; that in the spring of 1934 he was employed by appellant, Cavanagh, dumping trucks and driving caterpillar tractors on a highway being constructed by the latter, and that he continued in such employment until about June 14, 1934, at or near which time the work was suspended; that October 10, 1934, Cavanagh resumed construction of the highway and employed Evans to work thereon; that the superintendent in charge of construction put him to work, at 1 o'clock of the afternoon of that day, repairing Fresno scrapers which weighed approximately 350 pounds each; that the work consisted of tightening bolts and boring holes through timbers, which were approximately 4 inches thick, to be used as eveners and dump sticks, which timbers were either pine or fir; that there were about seventeen such scrapers to be repaired, ten of which were expected to be put in use the next day; that October 10, was a warm day, and that Evans had not performed any outdoor manual labor since June 14, preceding; that when he reported for work on the afternoon of October 10, he appeared to have taken on more weight and had the color of a man who had not been working outdoors; that he was put to work repairing scrapers because that was considered easier than clearing right of way; that about 1 o'clock of October 10, 1934, Evans commenced repairing the scrapers and in about twenty minutes had, with a brace and a five-eighths inch bit, bored five holes through the timbers; that the timbers on which he was working were placed across other timbers, two or three inches thick, lying on the ground; that it took considerable effort to bore the holes; that after he had worked about twenty minutes he went to a cook shack belonging to his employer, which was near the place he had been working, and asked for soda, saying he had a severe pain in the pit of his stomach and placing his hand on his chest; that he was not vomiting; that, not being able to obtain soda at the cook shack, he went to the home of Thomas C. Roberts, which was approximately

a hundred twenty-five steps from the cook shack; that when he arrived there he ''looked kind of pale as if he were in great pain'' and had beads of sweat on his face, and asked Roberts for soda and water, saying he had an awful pain and put his hand over his stomach; that he was given a teaspoonful of soda and a glass of water which he drank; that he then walked to the north side of Roberts' house and leaned his head against it; that he asked for and was given more water, of which he drank only a little; that a very short time afterward he again called for soda and water, stating he had an awful pain, and putting his hand over his stomach and saying the pain did not move; that he was given a chair and sat down on it and in a very short time fell off the chair with his face toward the ground; that two men raised him up on his knees, held him up and supported him by the arms, one of the men holding up his head; that his face was purple, and he was perspiring while in that position; that within ten minutes from the time he fell off the chair, and while he was being held up and supported as above stated, he died; that after he died his face was a purplish, or dusty, color; that his death occurred within thirty minutes from the time he first reached the Roberts house.

The evidence further shows that shortly after the death of Evans his body was removed to an undertaking establishment in the town of Malad and, about the middle of the afternoon of the day on which he died, his body was embalmed by a licensed and practicing undertaker, who, after injecting embalming fluid through the circulatory system and removing the blood therefrom, inserted a trocar to the left of the median line of the body; that the trocar was eighteen or twenty inches long and was inserted two-thirds of its length or more; that the insertion was made about two inches above and two inches to the right, as the body was faced, of the navel; that when the trocar was inserted a quart and a half or more of blood was aspirated from the body which, according to the testimony of the undertaker, had accumulated just to the right of the median line, below the diaphragm and posterior to the liver.

Shortly after the death of Evans, and prior to the removal of the body from the place where he died, Dr. Garst, a physician and surgeon who had been called, arrived. He examined the body and listened to statements of those who were present at the time Evans died, and expressed the opinion that the death was due either to acute gastritis or heart trouble. Dr. Garst did not learn of the discovery of blood outside the circulatory system of the body until after the burial. On being told of it by the undertaker, his belief as to the cause of death was changed, and he testified at the hearing before the board that, in his opinion, death resulted from a ruptured aneurysm of the aorta or one of the mesenteric arteries in the region of the abdomen, or of the hepatic artery or the renal artery.

The undertaker testified he was a graduate of the Washman School of Undertaking, of Chicago, and had been practicing his profession, at Malad, since 1919. He further testified to having embalmed the body of Evans and having found a quantity of blood therein, outside the circulatory system, as heretofore stated.

Dr. Brothers, a physician and surgeon, who had not heard the testimony of other witnesses, and had not seen Evans shortly before his death, nor examined his body afterward, was called on behalf of respondent. A properly framed hypothetical question was propounded to him in which was given the substance of the testimony showing the symptoms of deceased and the nature of his work immediately prior to his death; also stating the finding of blood in his body, outside the circulatory system, the amount of it and where it was found. Being admonished to assume the statements contained in the question to be true, he was asked his opinion as to the cause of death, to which he repied: ''I think he died of a ruptured aneurysm in the upper abdominal cavity.'' On being asked what, in his opinion, was the cause of the ruptured aneurysm, he replied: ''The increase in blood pressure due to exertion of working with the brace and bit.''

Dr. Newton, another physician and surgeon who had not seen Evans shortly prior to his death nor examined his body afterward, was called on behalf of appellants, and testified that he had heard the testimony of the witnesses (which,

however, did not include the testimony of Dr. Brothers).
He was asked:

"Q. From the testimony of the witnesses you have heard
testify in this case, what in your opinion was the most prob-
able cause of the death of D. P. Evans?

"A. The most probable cause was a coronary disease, in my
opinion.

"Q. Upon what do you base your opinion?

"A. The fact that his death was comparatively sudden.
He complained of pain which was in the upper abdomen or
in the lower chest, that he—the pain evidently did not sub-
side very much, considering his age which was about the age
at which we frequently see death from coronary disease; and
the fact that the evidence does not substantiate any other
cause of death to me."

He further testified:

"In your opinion did you hear any evidence presented in
this case which would indicate to you that D. P. Evans had
died from a ruptured aneurysm?

"A. No."

The cross-examination of this witness shows he did not ac-
cept the statements of the undertaker, with respect to the
amount of blood he found, and where he found it in the body,
as true. His answers to cross-examination show he did not
believe the undertaker would know blood if he saw it, nor
that he knew from what cavity, or cavities, in the body, he
drew it.

Finding of fact, by the board, numbered XII was as fol-
lows:

"That the death of the said D. P. Evans was not due to
a rupture of an aneurysm of the aorta or to a hemorrhage of
any of the mesenteric arteries or to a hemorrhage from the
hepatic artery or a hemorrhage of the renal artery, or to any
hemorrhage at all; that the death of the said D. P. Evans
was due to a disease; that the disease that caused the death
of said D. P. Evans was not the result of any injury and
was not the result of an injury by accident arising out of
and in the course of his employment with the defendant, Dan
J. Cavanagh."

The board made a ruling of law that respondent was not entitled to an award for compensation, and that her claim therefor should be denied. It thereupon made an order denying compensation, and dismissing the application therefor. The district court entered judgment reversing the order of the board and directing it to make an award in favor of respondent and against appellants. The case is here on appeal from that judgment.

In one particular this case resembles *Suren v. Sunshine Min. Co.,* 58 Ida. 101, 70 Pac. (2d) 399. There is little or no conflict in the evidence other than in the testimony of medical experts. The testimony of an expert as to his opinion is not evidence of a fact in dispute, but is advisory, only, to assist the triers of fact to understand and apply the testimony of other witnesses. Its value depends on, among other things, the expert confining himself in his testimony to the facts incorporated in the question propounded to him, and if he does not assume these facts to be true and base his answer on them, his testimony is worthless and should be rejected. It is for the triers of fact to determine whether the evidence on which the expert bases his opinion is true or not. It is not for the expert to assume the responsibility of determining the truth or falsity—the reliability or unreliability, of the testimony of other witnesses. For this reason he should not be asked to base his opinion on the testimony of other witnesses which he has heard, but the facts which that testimony tends to establish, and which is relied on by the party propounding the question, should be hypothetically stated, and the testimony of the expert should be responsive to that question, and it is his duty to assume those facts to be true. (*Cochran v. Gritman,* 34 Ida. 654, 203 Pac. 289; *People v. McElvaine,* 121 N. Y. 250, 24 N. E. 465, 18 Am. St. 820; *Dexter v. Hall,* 15 Wall. 9, 21 L. ed. 73.)

In *People v. McElvaine,* above cited, a question was propounded to an expert with respect to the sanity of the defendant in a murder case. The question was:

"Now, are you able to say whether, in your judgment, based upon all the testimony, the acts of the defendant on the night of this homicide, the testimony as to his past life given

by the witnesses in his defense, and based upon the whole case, whether this young man is sane or insane?''

The witness answered: ''I believe the defendant is sane. Q. What do you believe he was at the time of the commission of the offense? A. I believe he was sane at the time of the commission of the offense.''

The appellate court commenting on that testimony said:

''We cannot doubt but that this question was improper. The witness ·was thus permitted to taken into consideration all the evidence in the case given upon a long trial, extending over nine days, and, upon so much of it as he could recollect, determine for himself the credibility of the witnesses, the probability or improbability of their statements, and, drawing therefrom such inferences as, in his judgment, were warranted by it, pronounce upon the sanity or insanity of the defendant. It cannot be questioned but that the witness was by the question put in the place of the jury, and was allowed to determine, upon his own judgment, what their verdict ought to be in the case.''

The court further said:

''An attempt was subsequently made to, in some degree, cure the error committed, by proving by the witness that in answering the question he assumed the truth of the evidence given by the defendant's witnesses: but we think this did not remove the vice inherent in the question. Even as thus affected, it left the uncertainty of his memory as to all the evidence in the case, and the freedom of his judgment as to all other evidence, to give such weight as he should in his own mind determine it was entitled to, and substantially allowed him to usurp the functions of the jury in deciding the questions of fact. We think it is not competent, in any case, to predicate an hypothetical question to an expert upon all of the evidence in the case, whether he has heard it all or not, upon the assumption that he then recollects it; for it would then be impossible for the jury to determine the facts upon which the witness bases his opinion, and whether such facts were proved or not. Suppose the jury conclude that certain facts are not proved, how are they, in such an event, to determine whether the opinion is not, to a great degree, based upon such facts?''

It is true the testimony, above quoted, was objected to and the objection was overruled. In this case no objection was made to the testimony of Dr. Newton. A like situation was before the Supreme Court of North Dakota in *American Coal B. Co. v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 41 N. D. 381, 170 N. W. 568, wherein it was said, on petition for rehearing (page 570):

"Plaintiff contends that, inasmuch as there was no objection to Wright's testimony when it was offered, it became competent evidence, and must be so considered. The rule sought to be invoked is well established, but it does not go to the extent contended for by plaintiff. While the failure to object may constitute waiver of the incompetency of the evidence, 'it is not a waiver of the right to question its legal effect or its legal sufficiency.' 9 Ency. of Evidence, 113."

In *Sharp v. Baker*, 22 Tex. 306, the court, referring to evidence which was introduced without objection, said:

"The admission of such evidence, without objection does not add any weight to it, if intrinsically it had none, and should have been excluded, upon objection. Evidence does not have weight, because it is admitted; but it is admitted because it deserves to have weight."

For the reasons heretofore pointed out the testimony of Dr. Newton that, in his opinion, the most probable cause of the death of Evans was a coronary disease and that he did not hear any evidence presented in the case that would indicate to him that death resulted from a ruptured aneurysm, is not entitled to be given weight and must be rejected.

That testimony being eliminated, the remaining evidence is amply sufficient to establish that Evans died from a ruptured aneurysm due to increased blood pressure caused by the exertion required by the performance of the duties of his employment, and respondent is entitled to compensation provided by our workmen's compensation law for the dependents of employees who lose their lives by accident arising out of and in the course of their employment. (*Butler v. Anaconda Copper Min. Co.*, 46 Ida. 326, 268 Pac. 6; *In re Larson*, 48 Ida. 136, 279 Pac. 1087.)

334

The judgment appealed from is affirmed. Costs are awarded to respondent.

Holden and Budge, JJ., concur.

Ailshie and Givens, JJ., dissent.