(No. 6567.   October 7, 1938.)

D. R. EVANS, Appellant, v. BANNOCK COUNTY, a Body Politic and Corporate, D. C. RAY and W. F. HOWARD, Respondents.

[83 Pac. (2d) 427.]

O. A. Johannesen, for Appellant.

Milton E. Zener, O. R. Baum, Terrell & Bistline and Ben Peterson, for Respondent Bannock County; Merrill & Merrill, for Respondents D. C. Ray and W. F. Howard.

AILSHIE, J.—This is an action by appellant for damages against respondent Bannock county and D. C. Ray and W. F. Howard, as physicians and surgeons. Bannock county was owner of and operating the Pocatello General Hospital and defendants Ray and Howard were practicing physicians and surgeons who performed a herniotomy on appellant at the hospital. Negligence was charged as the basis of the cause of action. The cause was tried before the court and jury, and after the close of plaintiff's evidence, and on motion of defendants for a judgment of nonsuit, order was entered

granting the nonsuit and entering judgment of dismissal. From the judgment of dismissal this appeal is taken.

■ Appellant's first thirteen assignments of error are directed against the rulings of the court on the admission and rejection of evidence. These assignments involve three different groups of alleged errors: The first group is directed to the action of the trial court in sustaining objections to questions propounded to various of the witnesses who were called by plaintiff for cross-examination under the statute. (Sec. 16–1206; I. C. A.) The statute was construed in *Darry v. Cox,* 28 Ida. 519, 523, 155 Pac. 660, as follows:

"The act permits the examination of the classes of persons mentioned in the title, by the adverse party, as if under cross-examination. It does not authorize, nor was it the intention of the legislature to attempt to authorize, the impossible—the cross-examination of a witness who has not been subjected to direct examination. It permits a party to a civil action or proceeding to call as a witness the adverse party, or other person included in one of the classes above mentioned, and to prove by him a fact or facts in issue which could not, probably, be otherwise established, and to allow such witness to be examined according to the liberal rules of cross-examination whereby leading questions may be propounded."

This statute has frequently been under discussion by this court and the foregoing rule has been uniformly followed, as may be seen from the following cases: *Boeck v. Boeck,* 29 Ida. 639, 161 Pac. 576; *Portland Cattle Loan Co. v. Gemmell,* 41 Ida. 756, 757, 242 Pac. 798; *Morton v. Morton Realty Co.,* 41 Ida. 729, 241 Pac. 1014; *Estate of Brown,* 52 Ida. 286, 298, 15 Pac. (2d) 604; *Franklin v. Wooters,* 55 Ida. 619, 625, 45 Pac. (2d) 804.

■■ The trial court possesses a large discretion in allowing or denying questions on cross-examination under this statute. The purpose, of course, of the statute was to enable a litigant to call an adverse party or his representative and examine him concerning matters that are peculiarly within the knowledge of the witness and not easily accessible to the party calling the witness. On the other hand, it was never intended to allow a litigant to call the adverse party, his or its agent or representative, for the purpose of going over his

entire case and cross-examining him on everything that might be pertinent to the case in chief, and then not be bound by such evidence. We have examined the questions asked in this case and while we think it would have been proper to allow some of the questions, we are satisfied that there was no abuse of discretion by the court and no prejudicial error committed against appellant in sustaining objections to the questions propounded.

A further group of questions, comprising assignments 9, 10, and 11, is directed against the ruling of the court in sustaining objections to certain hypothetical questions asked of Dr. Clark Young whose deposition was taken in Salt Lake City. Objection was sustained to a hypothetical question (too lengthy to set forth herein) which was intended to elicit from the witness the effect that the injection of a solution of alcohol instead of novocain would have upon the area wherein the injection was made. The objection to this question was equally lengthy and called attention to the fact that many of the assumptions of proof contained in the question had not been, even *prima facie*, established; and that the question was not a fair representation of the evidence or of the conditions as they had existed at the time of the supposed injection. We think the court properly sustained the objection, for two reasons: The first of which was that there was at no time any proof that an alcohol solution had been injected instead of novocain; and furthermore the question assumed the proof of many facts that had not been suggested or covered by any evidence whatever. (Lawson on Expert and Opinion Evidence, 2d ed., pp. 164, 165.)

The next question to which objection was sustained is: "What effect does alcohol have on nerves?" There would have been no harm in allowing this question to be answered; on the other hand we fail to see where plaintiff could in any way be prejudiced by the court's sustaining an objection to this question, standing alone as it does.

The next question to which objection was sustained is as follows:

"Doctor, from the condition that you find the plaintiff's body in, at the present time, and if he is a man who operates and runs a farm, and does work outdoors, or outside, what

effect, if any, would such injuries have on him, in the use of that leg?"

This deposition was taken thirty months after the operation complained of. The question is too vague, indefinite and incomplete for a hypothetical question and the objection was properly sustained. It is also doubtful if the proof sought by the question is not an existing condition rather than hypothetical.

It is further contended that the court erred in sustaining objections to appellant's proffered exhibits A and B. These exhibits were identified (A) as the record of the operation as performed at the hospital and (B) as the progress record showing the condition of the patient from time to time subsequent to the operation. These exhibits were offered upon cross-examination, under the statute, of Dr. D. C. Ray. In sustaining the objection to these exhibits, the court said:

"You may let the record show, Mr. Reporter, that the objection to the Plaintiff's Exhibits 'A' and 'B' is granted, and particularly, in view of the statement by counsel that they were being offered as a part of the cross-examination of Doctor Ray, that is correct, is it not, Mr. Gustin?

Mr. GUSTIN: "That is correct, if the Court please, and under the statute."

So far as we can discover, the exhibits were never reoffered. The court appears to have predicated his ruling sustaining the objection, not upon the ground that the exhibits were inadmissible, at any time or for any purpose, but rather upon the ground that they were not a part of the cross-examination of the witness. We assume the court meant that the identification of the document was part of the cross-examination but that the document itself, if admissible, would be independent evidence as distinguished from a part of the witness' cross-examination and should be so introduced (see *Kroetch v. Empire Mill Co.*, 9 Ida. 277, 74 Pac. 868) as a part of plaintiff's case. It should be remembered that this cross-examination was of Dr. D. C. Ray, and plaintiff's chief reason for wanting to introduce the exhibit was to get before the jury a notation contained on exhibit "A" reading as follows: "Local anesthetic of 1% novocain (supposed to be) used." This notation appears to have been made at a dif-

ferent time from the other writing on the exhibit and it developed in the course of the trial that it was actually made by Dr. F. M. Ray some days after the operation.

It is strenuously argued that upon the whole record the plaintiff submitted sufficient evidence to entitle him to go to the jury and that the court erred in sustaining the motion for nonsuit. The rule of law applicable in such case was stated by this court in *Later v. Haywood,* 12 Ida. 78, 85 Pac. 494, as follows:

"On a motion by the defendant for nonsuit after the plaintiff has introduced his evidence and rested his case, the defendant must be deemed to have admitted all the facts of which there is any evidence, and all the facts which the evidence tends to prove."

This rule has been uniformly followed ever since the announcement of that decision. (*Stricker v. Hillis,* 17 Ida. 646, 106 Pac. 1128; *Donovan v. Boise City,* 31 Ida. 324, 171 Pac. 670; *Schleiff v. McDonald,* 37 Ida. 423, 216 Pac. 1044; *Coulson v. Aberdeen-Springfield Canal Co.,* 39 Ida. 320, 227 Pac. 29; *Sweetland v. Oakley State Bank,* 40 Ida. 726, 236 Pac. 538.)

Now let us see just what the issue was and what it became necessary for plaintiff to prove. The complaint is predicated upon the ground that the defendants, instead of using a solution of novocain as a local anesthetic, "carelessly, negligently and recklessly furnished, supplied and injected into and under plaintiff's skin and the underlying tissues of the right inguinal area a solution of alcohol, which said alcohol destroyed the tissues or the natural resistance of the tissues of said area to infection and caused to be broken down or infected plaintiff's skin, subcutaneous tissues, muscles and nerves in said area and plaintiff's right thigh," etc. The gist of the negligence charged is the injection of alcohol instead of novocain for anesthetic purposes. The plaintiff utterly failed to establish this fact and it was undoubtedly for that reason that the court granted the nonsuit. The nurses all testified that novocain was used and that *alcohol was not injected and was only used for the purpose of cleansing the surface prior to anesthetizing it.* No one testified that alcohol was injected.

The nurses received instructions about the operation from the doctors. Mrs. Miles, the nurse who was the supervisor of the surgery at the time, testified that ''The only thing in preparing the room is to put the novocain out, and, of course, wouldn't be any other anesthetic.''

''The novocain is sterilized in the bottle when first sent from the drug store.

''Q. How do you get it there?

''A. In a sterile medicine cup.

''Q. Just describe the medicine cup that it is placed in?

''A. The medicine in the cup that day was held over, put on the table; it was placed on the Mayo table the doctor places over the patient during the operation, and the doctors work on it.

''Q. Now, you say the novocain is put in a little cup?

''A. Yes.

''Q. That is in turn put on a table and that table is over the patient?

''A. Yes, sir.

''Q. After the patient lies prone on the operating table, is that right?

''A. Yes, sir.

''Q. What kind of looking cup was this novocain put in that particular morning?

''A. White enamel.

''Q. Is there any other kind of fluid, or was there any other kind of fluid similar in appearance to novocain at the time of this operation?

''A. Not on the Mayo table.

''Q. Was there any other kind of fluid in the room that was similar so far as external appearances are concerned to novocain?

''A. Yes.

''Q. What?

''A. Alcohol.

''Q. What kind of receptacle was the alcohol in?

''A. That was in a small, no, that was in a large enamel cup.

''Q. Was the enamel cup similar in appearance to the one that was used for the novocain?

"A. No.

"Q. Well, how did it differ?

"A. It was about a four ounce cup, probably five; about as large as a tea cup.

"Q. Was it the same kind of an enamel cup so far as appearance was concerned?

"A. So far as color is concerned but not the shape.

. . . . . . . . . . . .

"Q. Now, Mrs. Miles, on this particular morning do you know who filled the syringe with the solution that was to be injected presumably for the local anesthetic?

"A. Miss McKinsey did.

"Q. Miss McKinsey did?

"A. Yes.

"Q. Under your supervision?

"A. Yes.

. . . . . . . . . . . .

"Q. Were those syringes refilled out of the same cup each time?

"A. Refilled out of the cup on the Mayo table."

The Mayo table contained the instruments needed in the operation, novocain and syringes used for injecting the novocain. On the sterile or supply table was placed the pack, containing the sterile instruments, linens needed for the operation, methylate and alcohol cups.

"Q. And it was on that table that the alcohol and methylate was?

"A. Yes.

"Q. Was the alcohol ever over on the Mayo table?

"A. Never.

. . . . . . . . . . . .

"Q. What would be the first thing that happened, or what was the first thing that happened after Mr. Evans was brought into that operating room?

"A. The area of operation was painted.

"Q. And with what kind of a fluid?

"A. With alcohol and tincture methylate.

"Q. That was the general practice?

"A. Yes.

"Q. And that was done in this particular case?

"A. Yes."

Miss McKinsey, the student nurse who assisted the doctors, testified:

"Q. Now, calling your attention to the alcohol that was in the operating room at the time, I will ask you to state whether or not you observed that alcohol being used for cleansing?

"A. I did.

"Q. And can you describe to the jury just how the alcohol was used for cleansing?

"A. I would place it on an instrument and sponge. I put it on an instrument, the sponge on an instrument and dipped it in the alcohol and handed it to the operating nurse and she in turn bathes the area of the operation.

. . . . . . . . . . . .

"Q. Now, with reference to the sterile table, where was the bottles kept that contained these various fluids; that is, the methylate, the alcohol and novocain?

"A. The alcohol and methylate were kept on the window sill of the surgery; the novocain was kept on top of the medicine cupboard on the other side.

"Q. What kind of a bottle was it that had the novocain in it; what did it look like?

"A. It was about an eight ounce bottle and white.

"Q. And what kind of bottle had the alcohol?

"A. It was white, six ounce bottle with a square top.

. . . . . . . . . . . .

"Q. Will you just explain again how the alcohol solution was used, was it used by you or Miss Stegelmeier? [Mrs. Miles.]

"A. It was used by Miss Stegelmeier to paint but I gave it to her."

Both Mrs. Miles and Miss McKinsey testified that they couldn't remember the reactions of the patient at the time of injection of the anesthetic, nor any unusual demonstration that day by the patient.

The testimony of appellant, with reference to the operation, is, in part, as follows:

"Q. Just tell what you remember was done?

"A. I felt the prick of the needle they were injecting the medicine.

"Q. Injecting something into you?

"A. Yes, sir.

"Q. And did that take place more than once?

"A. Yes, sir, it did.

"Q. And what, if any, sensation did you have after the needle was pushed into your flesh?

"A. I had a severe burning of the tissues after the injection.

"Q. About how long were you on the operating table, if you know?

"A. I don't know; it seemed a long time to me. I couldn't tell how long, possibly hours; it could have been.

"Q. And you say there was a burning feeling?

"A. There was.

"Q. As compared with the beginning of that and the end of the operation, just tell the jury how it felt to you?

"A. It felt just like a burning sensation in there, a very intense burning.

"Q. Did it feel the same all the time?

"A. Yes, sir, it did. It got more severe as the operation proceeded.

"Q. When the Doctor who did the cutting commenced cutting I will ask you to state whether or not you could feel the knife in his hand upon your flesh?

"A. Yes, sir, I could.

"Q. Were you conscious of the cutting?

"A. Yes, sir, I was.

"Q. And could you feel all the time the cutting?

"A. Yes, sir, I could.

"Q. Now, after you had been on the table for awhile did the feeling that you have just told about continue?

"A. Yes, sir, it did.

"Q. Just state how you felt?

"A. Well, the stinging feeling after the injection had intensified as they went deeper, and toward the latter part of the operation it was intense; it grew intense, almost more than I could bear toward the latter part of it, and I was

making considerable fuss. I believe, at first I suppose I didn't know at any time but what it was necessary, and I just had to take it. I didn't make any fuss until the latter part of the operation and as it proceeded the pain got intense; it was just almost more than I could bear, the latter part, and I was at the verge of screaming out and telling them to stop, and right at that stage or about that time my leg from this area (indicating) went numb from this area down to my feet, that right leg went numb. . . . . I asked them if they wouldn't loosen the strap. I thought it was the strap that was shutting the blood off, and one of the doctors, I think Doctor Howard told me to wiggle my toes around supposedly to start the circulation, and when I attempted to do what I was instructed my leg was paralyzed and numb and I was unable to move it, and then a little later I asked the nurse. There was a nurse back behind. I was conscious, saw a nurse putting a towel over my face all the time, and I asked her if she wouldn't go around and rub the leg. No attention was paid to it and then I just never commented any more. I just laid there after the le*ft* went numb down from the area where they were working right down.''

After a thorough examination of the record before us we are unable to say that the trial court erred in granting a nonsuit of this case. The burden of proof was on the plaintiff and it was not sufficient to merely show a possibility or raise a suspicion that defendants may have been negligent. It takes some evidence, either direct or circumstantial, to take a case to the jury. (*Magee v. Hargrove Motor Co.,* 50 Ida. 442, 296 Pac. 774.)

The judgment will be affirmed. Costs are awarded to respondents.

Holden, C. J., and Morgan, Budge and Givens, JJ., concur.