420 P.2d 661

Howard FORMONT, Plaintiff-Appellant,

v.

James R. KIRCHER, Defendant-Respondent.

No. 9546.

Supreme Court of Idaho.

Dec. 31, 1965.

On Rehearing Nov. 21, 1966.

Kramer, Walker, Pope & Plankey, Twin Falls, for appellant.

J. F. Martin and C. Ben Martin, Martin & Martin, Boise, for respondent.

KNUDSON, Justice.

On May 29, 1961, plaintiff-appellant, while engaged in the loading of a horse into a truck, was thrown from the truck on to the ground, as a result of which he suffered, among other things, a compound comminuted fracture of the tibia and fibula of his right leg approximately 6 inches above the ankle joint.

Plaintiff was promptly taken to a hospital in Nyssa, Oregon, where he was treated by Dr. Kenneth E. Kerby, under whose care he remained until June 3, 1961, at which time he returned to his home at Paul, Idaho.

Upon returning to his home in Paul, Idaho, during the afternoon of June 3rd plaintiff's wife contacted defendant, Dr. James R. Kircher, by telephone, under whose care plaintiff remained until June 19th, on which date plaintiff was transferred to the Bannock Memorial Hospital in Pocatello, Idaho, and into the care of Dr. David Nelson, an orthopedic surgeon. Dr. Nelson saw plaintiff for the first time on June 20th. Following examination, treatment and evaluation of plaintiff's condition by Dr. Nelson during the five succeeding days, plaintiff's leg was, on June 26th, amputated at about 6 inches below the knee.

By this action plaintiff seeks to recover damages from Dr. Kircher allegedly resulting from defendant's negligence in his care and treatment of plaintiff. Trial was had before the court sitting without a jury, and judgment was entered in favor of defendant. This appeal is from the judgment entered.

Although the trial court found that defendant was negligent in his care and treatment of plaintiff, the court also found that it was not established that such negligence was the proximate cause of the loss of plaintiff's leg. Plaintiff contends that the court erred in so finding.

During our consideration of the questions presented by this appeal and as an aid to clarification of the facts, we shall follow the format adopted by the trial court by dividing the history of plaintiff's injury and treatment into five periods:

Period No. 1 (May 29th through June 3rd) includes the time when the trauma occurred. The bones of the fracture were forced through the clothing and boot which plaintiff was wearing and into the barnyard earth which contained manure and other debris.

This space of time also includes the period during which plaintiff was hospitalized at Nyssa, Oregon under the care of Dr. Kenneth Kerby. As a part of Dr. Kerby's treatment he debrided non-viable tissue and otherwise cleaned the wound; the fracture was manipulated and reduced; the skin edges were sutured together, leaving a small area for drainage, and a cast applied. The cast extended from just above the middle one-third of the right thigh to the toes. On the second day, due to swelling and numbness of the toes, the cast was split on the anterior side, up to the ankle. On the succeeding day by reason of tightness, due to swelling of the leg and foot, the cast was split to the knee. A combiotic, a combination of streptomycin and penicillin, was administered twice each day, and on the day plaintiff left the hospital at Nyssa he was changed to declomycin.

Period No. 2 (June 3rd through June 9th) The record discloses that upon arriving at their home in Paul, Idaho, during the afternoon of June 3rd, plaintiff's wife called defendant by telephone and advised him of the date and nature of plaintiff's injury; of plaintiff's stay in the Nyssa hospital, and that plaintiff's leg was in a cast. She also read to the defendant a note sent by Dr. Kerby which was a brief résumé of treatment which had been given plaintiff. The evidence is conflicting as to whether defendant was told, during said telephone conversation, that plaintiff possessed antibiotic tablets; however the court found that during this period plaintiff had medication which had been sent by Dr. Kerby. It is uncontradicted that defendant was at that time requested to provide medication for pain, which was prescribed. Plaintiff's wife testified that during this period she called defendant by telephone on an average of at least every other day because plaintiff "was having so much pain." Plaintiff testified that on Thursday, June 8th, he observed a watery colored spot about the size of a quarter on the cast, which developed, within a couple of days, into "a rather large brown spot."

Period No. 3 (June 9th through June 15th) Pursuant to previously scheduled appointment, on June 9th plaintiff went to defendant's office which was the first occasion defendant had seen the plaintiff. The details of this visit are also in dispute. It is undisputed that defendant took plaintiff's temperature, X-rayed the fractured leg and stated to plaintiff that the position and allignment of the fracture were satisfactory. Defendant acknowledges that he at that time observed a spot on the cast approximately 2 inches in diameter which he stated to be dry and appeared to be normal drainage from the wound; that there was no evidence of active drainage from infection. Plaintiff testified that he expressed his anxiety concerning his condition and specifically requested defendant to open the cast and examine the wound; that he stated to defendant, "I am afraid the damn thing is going to rot off."

Defendant's office record relating to his examination and treatment of plaintiff on that day is as follows:

"6–9–61 . . . No temp, needs considerable pain pills (excp & cod. gr ss)

EXAM : Has cast to mid-thigh which split to just below knee.

Has had bloody drainage in cast but no appearance fresh drainage. X-ray-position OK cast OK

Rx. Percordon
Carbitol

To Lower leg—
up for meals and bathroom ret in 1 wk.
prob tighten upper end cast."

As concerns defendant's treatment during this period the trial court found that

"On June 9, 1961, the Plaintiff's supply of antibiotics was exhausted. The Defendant knew, or should have, in the exercise of the standard of medical practice of this community, known of this fact. Good practice demanded that anti-biotic therapy continue from this date for at least another ten days but the Defendant prescribed no antibiotics and supplied none to the Plaintiff. This was a departure from the standard of medical practice in the community."

At this time an appointment was arranged for plaintiff to return to defendant's office on June 17th.

Period No. 4 (June 15th through June 19th) Plaintiff's wife testified that she called defendant by telephone on June 15th and told him that the cast on plaintiff's leg was getting moist at the site of the fracture and that the odor was getting to be so bad that she could hardly stay in the house with him, and wondered if there was something that could be done; that defendant only advised them to keep the appointment [June 17] as arranged. Defendant admits that he received a telephone call from plaintiff's wife on June 15th or 16th, at which time he told plaintiff's wife "that inasmuch as he was coming to my office the next day, that this additional time would not make any difference." In this connection defend-

ant's office record contains the following notation:

"6–15–61    Darvon 65 mg. q. 3–4 hours"

As concerns defendant's duty following receipt of the telephone call above referred to, the court found:

"On June 15, 1961, the wife of the Plaintiff telephoned the Defendant that the cast around the site of the fracture was getting moist and there was an odor connected with it, and that on the previous day the Plaintiff had run a temperature of 99 degrees. Good medical practice required the Defendant at this time to see the Plaintiff, to window the cast or otherwise subject the wound to observation, to take appropriate tests to determine the proper anti-biotics to administer to control the infection and to administer a broad spectrum anti-biotic different from declomycin until the tests indicated the proper anti-biotic to use. His failure to do this was a departure from the local medical standard of care."

On June 17th defendant saw plaintiff for the second time. The leg was still enclosed in the original cast. In describing the condition of the leg at that time defendant testified:

"There was an area on the anterior surface of the cast just above the ankle of approximately four inches in diameter which was quite moist. The cast was quite soggy and wet and there was some drainage exuding in the previous split in the cast in the same area. There was a definite odor to this drainage, which indicated that there was infection or some necrotic process going on underneath it in the leg."

Defendant's treatment on that occasion consisted principally of applying additional plaster on the posterior surface of the cast to provide additional rigidity. He also lengthened and tightened the cast at the upper end. No medication was prescribed. Defendant's office records contain the fol-

lowing notations relative to plaintiff's interview and treatment on that day:

"6–17–61 ...Feels about same temp 99+ one day. Has increased drainage.
  EXAM: Cast loose knee and above. Has soupy foul drainage site injury
  Rx. Cast tightened and extended higher on thigh. To return to remove window and then poss. hospital care."

Plaintiff's wife testified that on the following day, Sunday, June 18th, she called the defendant and told him that plaintiff was in "terrific pain"; that they were quite worried and inquired if something couldn't be done about it; that defendant replied, "We won't do anything today. We will keep the appointment tomorrow." Defendant refutes receiving such telephone call.

On June 19th plaintiff called at defendant's office and defendant described his treatment as follows:

"Q What did you do then on the 19th, Doctor?

"A On the 19th I cut a large window in the anterior surface of this cast, as I had informed them that I would. And we removed this wet portion of the plaster cast; below this was a considerable amount of the padding that one puts under a cast. Below that a layer of surgical four by four sponges approximately three quarters of an inch thick. This was all soaked with this foul smelling drainage. And after that I was able to expose the leg itself and view the portion of the leg that was visible through the window. It was evident that the leg had become infected. Some of the sutures that had been previously placed had been pulled through the tissues; there was a separation of the wound edges; there was a small portion of the tibia exposed in this area, which appeared to be dead

and non-viable. I removed the sutures remaining that I could get at through the window. I cleaned the area with zephiran chloride, placed some surgical sponges over the area which I taped to the cast, and advised them of the seriousness of this complication. I advised them I thought it would be best if they obtained the services of a specialist, * * *."

As to the happenings on that day the defendant's office records contain the following quoted notations:

"6–19–61...Cast window. Foul drainage. Silk sutures removed. Necrotic tissue bottom end of 3–4 inch Laceration exposing bone. referred to Dr. Nelson of Pocatello."

Period No. 5 (June 19th through June 26th) Immediately upon leaving defendant's office on June 19th plaintiff went to the hospital at Pocatello, where he was seen by Dr. Nelson on the following day. A brief statement of Dr. Nelson's participation in plaintiff's treatment is contained in the Doctor's letter addressed to defendant under date of September 5, 1961 (Plf. Exh. B), from which the following excerpt is taken:

"Examination: The right leg was examined through a large window cut on the cast and found that the skin was very reddened; a great deal of drainage was coming from the wound and the tibia was exposed, after trimming away a lot of dead skin. X-rays brought along with the patient show that the bone is in fairly satisfactory position without any internal fixation.

"The patient was admitted to the hospital for evaluation and antibiotics did not show any sign of cutting down the amount of infection and most of the infection was of a resistant strain. The bone was dead for quite an area and because of its location and because

of the infection and loss of skin, I felt that an amputation was the only reasonable treatment, as it might well go on for months or a year and still have to be amputated. I had a Dr. Bacon, another orthopedic surgeon, see the patient and he agreed that an amputation was the best procedure. Therefore on 6–26–61, after further examining the leg under anesthesia, an amputation was done six inches below the knee."

The trial court found that one of the areas in which defendant was guilty of departure from the standard medical practice was that during the period of defendant's treatment subsequent to June 9th defendant failed to direct that antibiotic therapy be continued. The record well supports this finding. Medical expert witnesses expressed the view that with this type of fracture and under such conditions the wound is particularly dangerous and fraught with potential of uncontrollable infection; that the treating physician is required to give the utmost attention and cautious care to such wound; that the administration of a proper antibiotic is a standard effective treatment of an infection. However there is no showing that the defendant, during his entire treatment of plaintiff (16 days), ever prescribed or supplied a single antibiotic.

The record clearly sustains the court's finding that defendant failed to pursue the standard medical practice in the community when he refused to see and examine plaintiff promptly after being advised by plaintiff's wife on June 15th that the cast was getting moist and there was odor from it and that on the previous day plaintiff's temperature was 99°. Although defendant was thereby informed of unmistakable signs of infection and was specifically requested to see the plaintiff, he took no further action and advised plaintiff in substance that since he was coming to defendant's office on the 17th it would be taken care of then "and that the additional time would not make any difference."

Such medical advice and treatment was in violation of accepted medical practice.

The uncontradicted evidence is that in this kind of injury infection is a definite possibility and that it can develop rapidly. In fact defendant testified that upon his first consultation with plaintiff he advised plaintiff that infection was a likely possibility, in language as follows:

"Q Doctor, I think you stated previously on the visit of the 9th of June that you informed the Formonts that complications were always a possibility with this kind of injury. What type of complications did you mean when you said that?

"A With this type of injury, infection is the most notable complication, although there can be others.

"Q But infection is the most serious possibility?

"A The most likely possibility."

In the opinion of experts who testified, the necessity of prompt and continued treatment of infection is strongly emphasized; that it is the standard practice to perform, as soon as possible, what is known as an "antibiotic sensitivity test," which is to culture the organism in an infection and treat it with various antibiotics which might be effective against it. Defendant acknowledged that such tests are an aid and a guide to the physician; that they are a standard part of the practice nowadays; that the drug which is discovered by such tests would in all probability be effective in a particular situation.

Such a test was never made by defendant, nor did he at any time make any test with a view to determining what antibiotic would likely be effective treatment for plaintiff. In contrast with defendant's treatment it is proper to note that one of the first things Dr. Nelson did upon seeing plaintiff on June 20th was to order that plaintiff be immediately given 250 mg. of chloromycetin, an antibiotic given to counteract infection. An antibiotic sensitivity test was made the same day which disclosed

that the organism present in plaintiff's infection was hemolytic strephylococcus and that it was sensitive to eight different antibiotic drugs. It is worthy of note that defendant acknowledged that the staph which was determined, through said sensitivity test, to be present in plaintiff's infection, in all probability should have been controllable.

Notwithstanding the repeated complaints by plaintiff of severe pain at the fracture site and his repeated requests that something be done during the 16 days of defendant's treatment, no medication was prescribed or provided other than for the relief for pain and as an aid to rest. The wound was never viewed or visually examined by defendant until the last day of his treatment, at which time defendant discovered that the leg had become infected; that necrotic flesh and purulent matter existed in and around the wound and serious complications existed. Among the serious complications which had set in was disclosed by the examination conducted by Dr. Nelson that "the bone was dead for quite an area."

The record discloses that Dr. Nelson advised plaintiff of the seriousness of the existing conditions, the damage to the soft tissue and the interference with the circulatory system and that it would take many months to procure a union if it could be done at all and that in the end he still might have to amputate the leg. Plaintiff thereupon consented to the amputation on June 26, 1961.

The principal question presented by this appeal is whether the trial court erred in finding that "the care or lack of care by the defendant for plaintiff was not established to be the proximate cause of the loss of plaintiff's leg." We think this conclusion was error.

■ The applicable and governing rule in this case is stated in Reinhold v. Spencer, 53 Idaho 688, 26 P.2d 796, as follows:

"The rule would seem to be that respondent was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that he show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. Helland v. Bridenstine, 55 Wash. 470, 104 P. 626. As is said in Dimock v. Miller, 202 Cal. 668, 262 P. 311:

"'If the rule of law is as contended for by defendant and appellant, and it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science.' Walter v. England, supra [133 Cal.App. 676, 24 P.2d 930]; Barham v. Widing, supra [210 Cal. 206, 291 P. 173]; Roberts v. Parker, 121 Cal.App. 264, 8 P.2d 908."

■ Our review of the record discloses that as concerns the period of June 9th through June 15th the court stated in his opinion that "there is a serious factual question whether there was evidence of increasing infection demanding care which the defendant did not give" during this period. The court specifically found that defendant's care and treatment of plaintiff subsequent to June 15th constituted a breach of the local standard of care. The evidence clearly establishes that defendant's treatment of plaintiff's wound was negligent; that such negligence resided more in what was not done than what was done and that the failure of defendant in properly treating plaintiff greatly increased the danger of infection and its uncontrollable status and was in violation of accepted medical practice.

The evidence is convincing that at the time plaintiff was transferred to the care of Dr. Nelson the infection had developed to the uncontrollable stage thereby necessitating the amputation. Dr. Nelson tes-

tified that staph infections are usually controllable and replied as follows:

"Q Are they controllable to the extent that the leg could be saved?

"A Yes usually."

In this connection the trial court stated:

"The fact, I find, is that while infections of this sort are sometimes uncontrollable, they can ordinarily be controlled if treated properly. It is not to be expected that a person with this type of injury and infection will lose his leg."

In considering this question it is significant to note that the trial court stated "there is evidence that proper care over the entire period of treatment could have been expected to produce different results" and that "it would not be difficult to hold the defendant responsible if he had had the plaintiff's case during the entire course of the treatment." There is no evidence whatever from which it can be reasonably inferred that plaintiff was not given proper care and treatment by either Dr. Kerby or Dr. Nelson, they being the only persons besides defendant who provided any special care or treatment for plaintiff. We find no evidence in the case which would justify even an inference that said doctors' services to the plaintiff were not strictly in keeping with the standard medical practice in their communities.

██ The evidence is clearly sufficient to establish that defendant's lack of attention and care constituted negligence which resulted in the loss of plaintiff's leg. No intervening cause was shown. It is convincing that ordinary prompt standard treatment should have been given by defendant to retard and inhibit the growth of infection in plaintiff's leg, and by applying the rule stated in Reinhold v. Spencer, supra, it was reasonable and natural to infer that such negligence was the proximate cause of the loss of plaintiff's leg. The evidence on the issue of proximate cause is so conclusive as to establish proximate cause as

a matter of law. We find that defendant's negligence was the proximate cause of the loss of plaintiff's leg and that the trial court erred in failing to so find.

The judgment is reversed and the cause remanded with instruction to enter judgment for plaintiff in such amount as the court shall determine to have been established as plaintiff's damages. The court may at its election reopen the case and permit the introduction of such additional evidence as the court deems proper tending to establish the amount of damages recoverable by plaintiff.

Costs to appellant.

McQUADE, C. J., and McFADDEN, TAYLOR and SMITH, JJ., concur.

### ON REHEARING

McFADDEN, Chief Justice.

Defendant strenuously urges that this court was in error in its original opinion wherein it was determined that the evidence on the issue of proximate cause is so conclusive as to establish proximate cause as a matter of law. Defendant also contends that as a matter of law the record fails to establish any negligence on the part of the defendant.

First considering the issue of negligence, the trial court made explicit findings of fact, not only in its "Findings of Fact," but also its written opinion rendered prior to entry of the findings of fact, conclusions of law and judgment. The trial court incorporated this written opinion into its findings of·fact and conclusions of law.

In its written opinion, the trial court found:

"I find that during period (4) there were no antibiotics, that there should have been and that the defendant should have known that there were none. His failure to administer antibiotics during this time must be characterized as a departure from the standard. I further

find, however, that there was not, during this period, evidence of odor and drainage requiring the opening of the cast and a change of procedure in treatment from that commenced by Dr. Kerby.

"I find that on June 15th the defendant learned of foul smelling drainage and should have immediately seen the plaintiff, opened the cast, taken appropriate tests and administered a broad spectrum antiobiotic different from declomycin until the tests indicated which antibiotic to use His failures in period (5) were a breach of the local standard of care, * * *."

These two paragraphs of the written opinion find their counterpart in the findings of fact, as follows:

"VII. On June 9, 1961, the Plaintiff's supply of anti-biotics was exhausted. The Defendant knew, or should have, in the exercise of the standard of medical practice in this community, known of this fact. Good practice demanded that anti-biotic therapy continue from this date for at least another ten days but the Defendant prescribed no anti-biotics and supplied none to the Plaintiff. This was a departure from the standard of medical practice in the community.

"VIII. On June 15, 1961, the wife of the Plaintiff telephoned the Defendant that the cast around the site of the fracture was getting moist and there was an odor connected with it, and that on the previous day the Plaintiff had run a temperature of 99 degrees. Good medical practice required the Defendant at this time to see the Plaintiff, to window the cast or otherwise subject the wound to observation, to take appropriate tests to determine the proper anti-biotic to administer to control the infection and to administer a broad spectrum anti-biotic different from declomycin until the tests indicated the proper anti-biotic to use. His failure to do this was a departure from the local medical standard of care."

Re-examination of the record herein discloses that these findings of fact are supported by competent, substantial, although conflicting testimony, and hence are binding on this court. Durfee v. Parker, 90 Idaho 118, 410 P.2d 962; King v. MacDonald, 90 Idaho 272, 410 P.2d 969; Meridian Bowling Lanes, Inc. v. Brown, 90 Idaho 403, 412 P.2d 586.

On the issue of proximate cause, the trial court stated in its findings of fact:

"The care or lack of care by the Defendant for the Plaintiff was not established to be the proximate cause of the loss of the Plaintiff's leg."

In its written opinion, the trial court stated:

"The fact, I find, is that while infections of this sort are sometimes uncontrollable, they can ordinarily be controlled if treated properly. It is not to be expected that a person with this type of injury and infection will lose his leg. The incidents of amputation must certainly be far smaller than the defendant and another witness suggest (50%); they are not more than the 20% Dr. Terhune suggested and quite possibly considerably less. *It would not be difficult to hold the defendant responsible if he had had the plaintiff's care during the entire course of the treatment.* However, he did not." (Emphasis added.)

" * * * There is evidence that proper care over the entire period of treatment could have been expected to produce different results, but there was none that proper care during the time of defendant's culpability would have."

The trial court had previously found the defendant guilty of negligence, first in *failure to continue antibiotic therapy,* and secondly in failure to window the cast and take appropriate tests to determine the proper antibiotic to administer. Both of these findings are directed to the failure of defendant to take steps necessary to control the infection.

Dr. Nelson, the orthopedic specialist who amputated plaintiff's leg testified:

"Q. Well, does it mean anything to you, Doctor, that the patient came to you, or at least was admitted to the hospital by you, on the 19th day of June, and on the 26th day of June you amputated the leg?

"A. Yes.

"Q. What would that indicate?

"A. Well it would indicate that there was reason for amputation.

"Q. What would that reason have been? What was the reason?

"A. Apparently the infection.

 *     *     *     *     *     *

"Q. * * * Can you recall, Doctor, why you amputated the leg?

"A. Apparently because of infection.

"Q. It was uncontrolled?

"A. Yes."

Defendant himself acknowledged that the probabilities were that if sensitivity tests had been taken and those antibiotics administered, which were disclosed as able to control the infection the particular infection would not have been uncontrollable.

■ The trial court in its written opinion quoted from Reinhold v. Spencer, 53 Idaho 688, 693, 26 P.2d 796, 798, as follows:

"The rule would seem to be that respondent was not required to prove his case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that he show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable."

The trial court in effect did find proximate cause from the chain of circumstances. However, because the defendant did not have the full care of plaintiff, the court concluded there was no proof of proximate cause. In Pigg v. Brockman, 85 Idaho 492, 381 P.2d 286 (1963), this court held that there can be more than one proximate cause of an injury. Therein, this court quoted with approval the following statement from Riddle v. Artis, 243 N.C. 668, 91 S.E.2d 894, as follows:

" 'It is elemental that there may be two or more proximate causes of an injury. These may originate from separate and distinct sources or agencies operating independently of each other; yet if they join and concur in producing the result complained of, the author of each cause may be held liable for the injuries inflicted, * * *.' " 85 Idaho 501, 381 P.2d 291.

The negligence of the defendant concurred in the final result, and the trial court was in error in its conclusion that a causal relationship was not established.

■ It is asserted by defendant that there is conflicting testimony which bars this court from consideration of this issue. Defendant points to the testimony of Dr. Kelly:

"Q. Dr. Kelly, based upon the evidence that you have—or the facts you have heard of this case, do you have an opinion as to what was the cause of the loss of this foot and portion of a leg of Mr. Formont?

"A. Well, I think the reason he lost his leg was due to the severity of his injuries. He had torsion of his vessels, he had embarrassment of circulation, he had a lot of soft tissue injury, and, of course, he had infection. But the reason he lost his leg was because he had such a severe injury and no blood supply practically was left to that portion of that extremity."

Dr. Kelly testified that he had never seen the injury, and had never discussed the case with either Dr. Kerby or Dr. Nelson. The opinion given by Dr. Kelly quoted above, was not given in response to a hypo-

thetical question, and was not based on his own personal knowledge of the case. All he knew of the case was that he had heard in the courtroom, and what he had obtained in discussion with others, which discussions were outside of the courtroom. In Evans v. Cavanagh, 58 Idaho 324, 73 P.2d 83 (1937), this court held that the testimony of a physician called as an expert witness, was not entitled to be given any weight even though it was admitted without objection, when the testimony was not based on a hypothesis of facts relied on by the party propounding the question, but involved determination of truth and reliability of other witnesses. In explanation of the reason for such holding, this court quoted from People v. McElvaine, 121 N.Y. 250, 24 N.E. 465, 18 Am.St.Rep. 820, as follows:

" 'We cannot doubt but that this question was improper. The witness was thus permitted to take*n* into consideration all the evidence in the case given upon a long trial, extending over nine days, and, upon so much of it as he could recollect, determine for himself the credibility of the witnesses, the probability or improbability of their statements, and, drawing therefrom such inferences as, in his judgment, were warranted by it, pronounce upon the sanity or insanity of the defendant. It cannot be questioned but that the witness was by the question put in the place of the jury, and was allowed to determine, upon his own judgment, what their verdict ought to be in the case.' " 58 Idaho 332, 73 P.2d 86.

See also: American Coal B. Co. v. Minneapolis, St. P. & S. S. M. Ry. Co., 41 N.D. 381, 170 N.W. 568 (1919); Buckeye Cotton Oil Co. v. Cheraw Ginning Co., 142 S.C. 247, 140 S.E. 581, dissenting opinion (1927); United States v. 13.40 Acres of Land in City of Richmond, 56 F.Supp. 535 (D.C.Cal.1944); Rogers on Expert Testimony, 3rd Ed. 1941, § 153, p. 362; Wigmore on Evidence, 3rd Ed. 1940 § 681(b).

It is our conclusion that the opinion of Dr. Kelly was not entitled to be considered as presenting any conflict within the rule that when there is *competent,* substantial, although conflicting evidence, findings of fact are binding on this court.

Subsequent to release of the, original opinion in this case, KNUDSON, J., retired, and SPEAR, J., was appointed to fill the vacancy thus created. The original opinion written by KNUDSON, J., is adopted as the opinion of the majority of this court as now constituted.

The judgment is reversed and the cause remanded with instructions to enter judgment for plaintiff in such amount as the court shall determine to have been established as plaintiff's damages. By reason of the fact that the district judge who initially tried this case has since resigned from office, the trial judge who hears this cause may reopen the case and permit the introduction of such evidence as the court deems proper tending to establish the amount of damages recoverable by plaintiff.

Costs to appellant.

TAYLOR and SPEAR, JJ., concur.

McQUADE, Justice (dissenting):

I dissent from the decision of the majority that the record in this case establishes as a matter of law that respondent's conduct proximately caused the injury of which appellant complains.

On May 29, 1961, while appellant and his wife were visiting friends in Nyssa, Oregon, appellant fell from a truck onto ground strewn with manure and other debris, suffering a compound comminuted fracture of the tibia and fibula of his right leg, six inches above the ankle joint. Bones protruded through his clothing and boot into the filthy earth, which, the trial court found, probably contained infectious organisms.

Appellant was promptly taken to a hospital in Nyssa, where Dr. Kenneth E. Kerby debrided nonviable tissue, otherwise cleansed the wound and manipulated and reduced the fracture. Dr. Kerby then sutured the wound and applied a plaster cast which extended from the middle third of the right femur to just above the toes of the right foot. While cleansing the wound, the trial court found, Dr. Kerby discovered that the soft tissue and circulatory system of the lower right leg had been damaged.

On the next day, the court found, "the circulation was so impeded by reason of the swelling and tightness of the cast that the right foot became discolored, cold and numb and it was necessary for Dr. Kerby to split the cast up to the ankle." On the following day, the court found, it was again necessary to split the cast, this time to the knee, since "because of the tightness of the cast and the swelling in the leg and foot, the circulation was so impeded that the foot and toes continued to remain discolored and cold." The court also found "that the swelling and further imped[i]ment of the circulation may have increased the damage already done to the soft tissue and circulatory system" of appellant's right foot and leg. A combiotic was administered twice each day to combat the possibility of infection. When appellant left the hospital, declomycin was substituted for the combiotic, though it later proved to be ineffectual.

On June 3, the sixth day after the fracture, appellant left the hospital at Nyssa and returned with his wife to their home in Paul, Idaho. Late that afternoon appellant's wife first contacted respondent. The trial court found that she then advised him of the injury, read a note written by Dr. Kerby, and told respondent that she had a supply of medication prescribed by Dr. Kerby. In its opinion, the court noted that from June 3 to June 19 appellant had a supply of declomycin which had been prescribed by Dr. Kerby. At the request of Mrs. Formont, respondent prescribed a drug to relieve appellant's pain and made an apointment to see him on June 9. The trial court stated in its opinion that from June 3 to June 9 there was no evidence of increasing infection.

On June 9, the twelfth day after the fracture, appellant and his wife kept their appointment at respondent's office in Burley, Idaho, and respondent first saw the broken leg. At that time, the court found, appellant's temperature was normal, the toes of his right foot were warm and had good color, the cast was dry (although spotted near the wound), and there was no odor. The fractured leg was X-rayed and the bone alignment found to be good. At the end of this examination, an appointment was scheduled for June 17. The trial court found that on June 9 respondent should have known that appellant's supply of antibiotics was exhausted and should have prescribed or supplied antibiotics for his use, and that failure to do so was a departure from the standard of medical practice in the community. Respondent's failure to prescribe or supply antibiotics on June 9 was the only negligent act or omission with which the court charged respondent as of that day.

The trial court stated in its opinion that from June 9 to June 15 there was no evidence of odor and drainage requiring the opening of the cast and a change of treatment procedure from that commenced by Dr. Kerby. On June 15, the eighteenth day after the fracture, Mrs. Formont again phoned respondent and told him that the cast was moistening around the fracture and that there was an odor connected with it. The court found that upon receiving this phone call, the standard of medical practice in the community required respondent to then see appellant, window the cast or otherwise subject the wound to observation, take an antibiotic sensitivity test, and administer a broad spectrum antibiotic different from declomycin until tests indicated the proper antibiotic to use.

Respondent saw appellant on June 17, pursuant to the appointment made on June 9. The trial court found that on this day there was a foul odor connected with the wound, and the cast around it was damp. Respondent strengthened the cast and set appellant's next appointment for June 19. On June 19, the twenty-second day after the fracture, respondent windowed the wound and found infection existing with necrotic flesh and purulent matter and the bone partly exposed. Respondent immediately told appellant that he should be placed in a specialist's care, the trial court found, and made arrangements for appellant's further treatment with Dr. David J. Nelson, an orthopedic surgeon in Pocatello. That same day, appellant was admitted to Bannock Memorial Hospital in Pocatello under the care of Dr. Nelson and examined by him. Treatment with chloromycetin, an antibiotic, was then begun and the infectious organisms were tested to determine their sensitivity to different antibiotics. The tests showed that appellant's infection appeared sensitive to eight separate antibiotics but not to declomycin. Although the tests indicated the infection sensitive to chloromycetin, clinically this drug failed to control the infection and Dr. Nelson withdrew its administration on June 24.

In a letter to respondent, noted in this court's original opinion (December 31, 1965), Dr. Nelson stated that his examination on June 19 showed that:

"* * * the skin was very reddened; a great deal of drainage was coming from the wound and the tibia was exposed, after trimming away a lot of dead skin. * * *

"* * * antibiotics did not show any sign of cutting down the amount of infection and most of the infection was of a resistant strain. The bone was dead for quite an area * * *."

This court in its original opinion states:

"The evidence is convincing that at the time plaintiff [appellant] was transferred to the care of Dr. Nelson the infection had developed to the uncontrollable stage thereby necessitating the amputation."

The trial court found that the care or lack of care by respondent was not established to be the proximate cause of the loss of appellant's leg. In his opinion the trial judge found the test of proximate cause in this case to be:

"* * * whether the proper course of conduct would have 'fairly probably' changed the result. In other words, there must be testimony that * * * the proper conduct * * * ordinarily produces different results."

The trial judge states in his opinion that to have carried his burden of proof on the issue of proximate cause, appellant:

"* * * must have presented, or had presented through the defendant or his witnesses, testimony that had the defendant [respondent] in period (4) [between June 9 and June 15] continued the declomycin therapy and/or during period (5) [between June 15 and June 19] taken the steps previously spoken of [observed the wound and administered a broad spectrum antibiotic different from declomycin and tested for antibiotic sensitivity] there is a fair probability that different results would have been produced. To do this he needed to show that in similar medical histories such actions ordinarily produced different results. I cannot say that he has done this."

Further discussing the issue of proximate cause, the trial judge noted in his opinion on a motion after judgment that between June 9 and June 15 respondent should have continued the administration of "declamyecin [sic], a drug to which the organism was not shown to be sensitive to." He also notes in this opinion:

"The fact that the organism apparently wasn't controlled by declamyecin [sic] during some six or seven days of its use would indicate a lack of sensitivity.

"* * * This period's inactivity does not establish causation.

"On June 15th the Defendant [respondent] should have taken a sensitivity test, administered a broad spectrum anti-biotic until the test results were available and then administered the proper drug. These things he didn't do but the total time is short; the time for administration of a tested drug is presumeably even shorter."

(There was expert testimony that 36 to 48 hours were required to complete the antibiotic sensitivity tests.)

The trial court concluded in its opinion:

"There is evidence that proper care over the entire period of treatment could have been expected to produce different results, but there was none that proper care during the times of defendant's culpability would have."

The original opinion in this case stresses the statement in the trial court's opinion that "while infections of this sort are sometimes uncontrollable, they can ordinarily be controlled if treated properly." This statement must be construed in light of the trial court's findings that the full plaster cast which Dr. Kerby applied to appellant's injured leg on the day of the fracture had to be split to the ankle the next day and to the knee the succeeding day due to the impediment to circulation caused by the tightness of the cast and the swelling of the leg and foot and its further findings this "swelling and further impediment of the circulation may have increased the damage already done to the soft tissue and circulatory system of the right foot and leg of the Plaintiff [appellant]."

Also relevant on the issue of proximate cause is the following testimony of Dr. Nelson, Dr. Kelly and Dr. Terhune:

Dr. Nelson testified that the "golden opportunity" to save the leg was in the 12 hours immediately after the accident, and Drs. Kelly and Terhune both agreed with this statement. Dr. Terhune testified that the danger of losing the leg depended on "your initial treatment and your follow-up care in the next several days." Dr. Kelly testified that the "initial treatment * * is really the important thing."

Dr. Terhune testified that the practice "in this vicinity" was not to suture and cast this fracture, but rather to "put a posterior molded splint on it so the plaster cast is [at] the back of the leg and down the foot, placing your dressings on first so you could change the dressing on this leg at daily intervals or every other day as necessary; have good actual visibility of your wound." Dr. Nelson testified regarding the wound, "obviously it shouldn't have been closed." Dr. Kelly testified, "It was a compound comminuted fracture; it was contaminated and I don't think any contaminated wound should be closed; it is not the practice to close that type of wound." His testimony also contains the following colloquy:

"Q Would it have been the practice in this community to have sutured that wound?

"A Well, I wouldn't have sutured it.

"Q Sir?

"A I would not have sutured it.

"Q And what do you say about the cast being applied from the base of the toes to up above the knee, mid-thigh?

"A I don't think it should have been, had a cast put on.

"Q It should not?

"A (Witness shakes head.)"

Respondent testified as follows:

"Q Now Doctor, we all know that down at Nyssa this leg was sutured and cast. Now do you know the standard of practice in this vicinity with reference to that procedure?

"A Yes, sir.

"Q Would it have been proper and within the standards of medical practice in

this vicinity to have not sutured that wound?

"A  Yes, sir, that would have been within the standard.

"Q  And under the standard of practice in this vicinity, would you have applied that cast?

"A  No, sir."

In support of its decision that the record establishes proximate cause as a matter of law, the majority, in both this opinion on rehearing and its original opinion, cites *Reinhold v. Spencer*, 53 Idaho 688, 26 P.2d 796 (1933).

In that case this court merely upheld a jury's finding that a hypodermic needle left in the plaintiff's chest after an operation by the defendant doctor was the proximate cause of pain in and about the region where the needle was located. The opinion in Reinhold v. Spencer, supra, states:

> "The expert testimony would seem to establish beyond serious controversy that the pain suffered by respondent was due directly to the presence of the needle and not to some other cause or causes."  53 Idaho at 692, 26 P.2d at 798.

In Dimock v. Miller, 202 Cal. 668, 262 P. 311 (1927), cited in Reinhold v. Spencer, supra, and quoted in the original majority opinion herein, the Supreme Court of California merely upheld a jury's determination that defendant doctor's injection of infectious matter into plaintiff's arm was the proximate cause of an infection in the arm which developed almost immediately. Two doctors testified in *Dimock* that their opinion was that the infection was probably due to the injection.

Appellant had the burden of proof on the issue of proximate cause, and "the mere showing of a possibility or a suspicion that the negligence or unskillful treatment received at the hands of a physician or surgeon hastened or accelerated the * * [injury complained of] is not sufficient" to support that burden. Willis v. Western Hospital Association, 67 Idaho 435, 447, 182 P.2d 950, 957 (1947). See Matheson v. Idaho Hardware & Plumbing Co., 75 Idaho 171, 270 P.2d 841 (1954); Swanson v. Wasson, 45 Idaho 309, 262 P. 147 (1927). Cf. Hale v. Heninger, 87 Idaho 414, 393 P.2d 718 (1964); Evans v. Bannock County, 59 Idaho 442, 83 P.2d 427 (1938).

In Hancock v. Halliday, 70 Idaho 446, 220 P.2d 384 (1950), an action against four physicians and surgeons for alleged malpractice proximately causing the amputation of plaintiff's leg at the knee, plaintiff contended that if the preponderance of the evidence was against the finding of the trial court, its judgment should be reversed. This court said:

> "Whatever may be the holdings in other jurisdictions, such is not the rule in this state. This court has frequently and consistently held that findings of fact, sustained by competent, substantial, though conflicting, evidence, will not be disturbed on appeal." 70 Idaho at 448-449, 220 P.2d at 385.

The record supports the trial court's finding that the care or lack of care by respondent was not established to be the proximate cause of the loss of appellant's leg. See Reinhold v. Spencer, supra; Dimock v. Miller, supra; and McAlinden v. St. Maries Hospital Ass'n., 28 Idaho 657, 156 P. 115 (1916).

RASMUSSEN, District Judge, concurs in the dissent.